IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| Aaron Rosen, | ) | OPINION |
| | ) | |
| Petitioner, | ) | Case No. 20110497-CA |
| | ) | |
| v. | ) | F I L E D |
| | ) | (October 18, 2012) |
| Saratoga Springs City and Saratoga | ) | |
| Springs City Employee Appeals Board, | ) | 2012 UT App 291 |
| | ) | |
| Respondents. | ) | |

-----

Original Proceeding in this Court

Attorneys:    Ryan B. Hancey, Salt Lake City, for Petitioner
               Heidi E. C. Leithead and Mary Ann May, Salt Lake City; and Kevin S.
               Thurman, Saratoga Springs, for Respondents

-----

Before Judges Davis, Roth, and Christiansen.

DAVIS, Judge:

¶1     Aaron Rosen challenges the decision of the Saratoga Springs City Employee
Appeals Board (the Board) upholding his demotion in the Police Department for
Saratoga Springs City (the City).  We set aside the Board's order and direct it to revisit
its findings in light of this opinion.

BACKGROUND

¶2     Rosen's demotion from corporal to top step police officer arose from an incident occurring on January 18, 2011, in which Rosen dropped his pants in the presence of a female records clerk (Clerk) at the police department, an event the Board described as a "wardrobe malfunction." Rosen's pants fell to around his knees, and it is unclear if anything besides his shirttails and underpants were visible. Rosen claims that in an attempt to "downplay [his] idiocy" and embarrassment, he made a comment to Clerk that she interpreted as inappropriate. The appeal focuses on what Rosen was ordered to do or not do in the wake of this pants-dropping incident.

¶3     The incident prompted an internal affairs investigation during which the investigating officer, Sergeant Kerry Cole, claims to have instructed Rosen on January 19, 2011, (Sergeant Cole's January 19 Instruction) to restrict his contact with Clerk to "'professional contact' . . . until things 'cooled off.'" Rosen interpreted that instruction as requiring him to limit his contact with Clerk during the investigation period by refraining from discussing the investigation and by conducting any interactions with her within the physical confines of the police department, but not necessarily to restrict those interactions to work-related matters.[1] Several days later, on January 26, 2011, Rosen placed a circus ticket in Clerk's department mailbox as an apparent peace offering. He obtained the ticket from his part-time job at a radio station. On the ticket he left a note stating, "Sorry so late! Enjoy!"[2] Also on January 26, Rosen responded to an e-mail Clerk sent to the entire department about a work-related matter. Rosen's response did not answer the work-related question posed by Clerk in the e-mail but attempted to make a joke and exchange pleasantries. Clerk described feeling as though the e-mail was mocking her. At the close of the internal investigation on January 28, 2011, Police Chief Gary Hicken "gave [a] verbal reprimand to Corporal Rosen" (the

---

[1]On appeal, Rosen argues that Sergeant Cole simply never gave a "professional contact" only order.

[2]Rosen explained that he was unable to get Clerk tickets to an event she had asked about "last fall . . . so he got her the[ circus ticket] instead."

Verbal Reprimand) as a result of the pants-dropping incident and permitted Rosen to make a brief, casual apology to Clerk.[3]

¶4      On February 2, 2011, Chief Hicken met with Rosen and "ordered Rosen to have nothing but 'professional contact with [Clerk], and nothing else'" (Chief Hicken's February 2 Order). Like Sergeant Cole's January 19 Instruction, Rosen interpreted this latest instruction as requiring him to refrain from contacting Clerk outside of work and to maintain professionalism while at work. However, several days later, on February 7, while passing through the front office, Rosen congratulated Clerk for winning a River Dance ticket giveaway at his radio station. Without Clerk's prior knowledge or permission, Rosen had entered Clerk's name into the giveaway. She was selected at random for the prize and received several phone calls from relatives informing her that they heard her name read over the radio as the contest winner.

¶5      That same day, Rosen was placed on paid administrative leave, at which time Chief Hicken repeated to Rosen "that there is to be no contact, no gifts, no [third] party contacts or any other conduct which could be interpreted by [Clerk] as embarrassing, humiliating, or any other unwanted recognition of any kind." In light of the circus ticket and River Dance incidents, the internal investigation was reopened and Rosen met with Sergeant Cole again on February 11, 2011. In response to the reopened investigation, Rosen submitted a written statement (the prehearing statement) to Sergeant Cole summarizing his feelings and opinion on the events. In the prehearing statement, Rosen described Sergeant Cole's January 19 Instruction as requiring him to "only communicate with [Clerk] 'professionally' as needed, until the conclusion of the [internal investigation]." Ultimately, Sergeant Cole's recommendation at the close of the renewed investigation was that Rosen be demoted for failing to follow his January 19 Instruction by giving Clerk a circus ticket, and Chief Hicken's February 2 Order by entering Clerk in the River Dance giveaway. Chief Hicken adopted that recommendation and demoted Rosen, characterizing the circus ticket and River Dance incidents as insubordination and conduct unbecoming an officer.

---

[3]Rosen disputes whether he had a meeting with Chief Hicken on January 28, 2011; however, a letter Rosen authored and his testimony indicates that such a meeting occurred on that date. The ambiguity about this meeting goes to whether the Verbal Reprimand also included an order that Rosen restrict his interaction with Clerk to professional contact.

¶6     Rosen appealed his demotion to the Board, arguing that "[h]e was not given an order and he was not insubordinate" and that "the discipline he received was not proportionate to his alleged offense nor was it consistent with other discipline meted out by the City." The Board upheld the demotion, concluding that giving Clerk a circus ticket and entering her into the River Dance giveaway did not amount to professional contacts and were made by Rosen intentionally, despite his being instructed by his superiors on at least two occasions to limit his contact with Clerk to professional matters. The Board determined that Rosen's "failure to follow specific instructions and the Chief's direct orders . . . is insubordination, which is a serious offense." The Board observed that Rosen's conduct "created a significant disruption within the [Police] Department, and it further illustrates his poor judgment, and an inability to lead others by his example," thus justifying his demotion from a supervisory position.

ISSUES AND STANDARDS OF REVIEW

¶7     Rosen argues that the Board's decision to uphold his demotion was not supported by substantial evidence and that the Board's failure to make adequate findings of fact has deprived him of the right to a meaningful appeal. Next, Rosen contends that the Board abused its discretion by failing to address the proportionality and consistency of the discipline imposed in light of the nature of the offense and the Police Department's history of disciplinary actions. Rosen also asserts that because the City failed to produce the recording of Rosen's January 19 investigation interview with Sergeant Cole, the Board should not have denied Rosen's motion for an adverse inference, which would have required the Board to accept Rosen's description of Sergeant Cole's January 19 Instruction. Last, Rosen argues that Board members were "improperly influenced by having reviewed the City's evidence in advance" of the hearing, thereby "taint[ing] the hearing and caus[ing] irreversible prejudice to Rosen."

¶8     We review the Board's actions "for the purpose of determining if the [Board] abused its discretion or exceeded its authority." Utah Code Ann. § 10-3-1106(6)(c)(ii) (Supp. 2012). We will uphold the Board's decision "unless it exceeds the bounds of reasonableness and rationality." *See Nelson v. Orem City, Dep't of Pub. Safety*, 2012 UT App 147, ¶ 17, 278 P.3d 1089 (citation and internal quotation marks omitted). We review the Board's findings for substantial evidence. *See Lucas v. Murray City Civil Serv. Comm'n*, 949 P.2d 746, 758 (Utah Ct. App. 1997). Last, to the extent Rosen's arguments

implicate matters of due process, we review those claims for correctness. *See Nelson*, 2012 UT 147, ¶ 18.

ANALYSIS

I. Substantial Evidence

¶9     Rosen argues that the Board's findings were not supported by substantial evidence. *See generally Lucas*, 949 P.2d at 758 (applying a substantial evidence standard for appeals from a municipal administrative body). "Substantial evidence is that quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion. It is more than a mere 'scintilla' of evidence and something less than the weight of the evidence." *Id.* (citations and internal quotation marks omitted). In conducting this review, we defer to the Board's credibility determinations. *See id.* Rosen challenges three particular findings. We address each in turn.

A. The January 19 Interview with Sergeant Cole

¶10     Rosen contends that during the January 19 interview, Sergeant Cole did not order Rosen to limit his interactions with Clerk to professional matters; rather, Sergeant Cole recommended that Rosen restrict his interactions with Clerk, while ordering him to refrain from discussing the internal affairs investigation with her until it was over. Because Rosen did refrain from discussing the investigation with Clerk, he maintains that he complied with the only order he asserts he was given at that time. Thus, according to Rosen, giving Clerk the circus ticket could not amount to insubordination of that order.

¶11     We disagree. While the record does contain evidence that is somewhat unclear regarding exactly what was said during the January 19 interview, we determine that substantial evidence supports the Board's finding that Sergeant Cole indeed gave a "professional contact" order to Rosen at that time.

¶12     Sergeant Cole testified that on January 19, he told Rosen that Clerk had filed a formal complaint and that until the internal investigation was over, "there was to be no

contact with her except for professional contact." Sergeant Cole also testified that he informed Clerk and Clerk's supervisor (Supervisor) that Rosen "wasn't to talk to" Clerk. Clerk's testimony corroborated this, describing her understanding of Sergeant Cole's order to restrict Rosen from having any "contact with [her] at all. And that if any contact was made or anything happened, that [she] was to directly report to [Sergeant Cole]." Supervisor testified similarly, stating she understood the situation after the January 19 interview to be such "that there should be no contact whatsoever between [Rosen and Clerk]."

¶13 Additionally, the City played a portion of a recording of the February 11 interview Sergeant Cole conducted with Rosen when the internal affairs investigation regarding the pants-dropping incident was reopened. During the recording, Sergeant Cole asked Rosen about the January 19 interview as follows:

> [Sergeant Cole:] Okay. You don't remember I said to you, you shouldn't talk to [Clerk] unless it's business, professional, at a professional level?
>
> [Rosen:] Right, yes.
>
> [Sergeant Cole:] Do you remember that?
>
> [Rosen:] Right.

Likewise, Rosen's prehearing statement summarized the January 19 interview, stating,

> I'd like to repeat the fact that during the January [interview], you advised me to "not discuss the details of the investigation" with [Clerk], or have any conversation with her about the incident. You said she was "sensitive" at the time, and *that I should only communicate with her "professionally" as needed, until the conclusion of the [investigation]*.

(Emphasis added.) Rosen testified, however, that Sergeant Cole only ordered him to "not talk to [Clerk] about the details of the [investigation]" and to "be professional with [Clerk], and give it some time . . . [to] cool off."

¶14 Three witnesses' testimony of having a similar understanding of Sergeant Cole's January 19 Instruction, as well as Rosen's own words in the prehearing statement, constitute substantial evidence on which the Board could base its finding that Rosen was in fact *ordered* on January 19 to refrain from interacting with Clerk except for when it was necessary to conduct his work. We do not disturb the Board's credibility determinations or its resolution of any conflicts in the evidence. *See Allen v. Department of Workforce Servs.*, 2005 UT App 186, ¶ 20, 112 P.3d 1238 ("[W]here inconsistent inferences can be drawn from the same evidence, it is for the Board to draw the inferences."). Having upheld Rosen's demotion, the Board presumably found the testimony from Sergeant Cole, Supervisor, and Clerk to be more credible than Rosen's, and resolved any inconsistencies in their testimony in favor of its finding that Rosen was ordered on January 19 to limit his interactions with Clerk to professional contact. We therefore conclude that this finding was supported by substantial evidence.

B. The E-mail to Clerk

¶15 Rosen contends that the Board impermissibly based its determination upholding his demotion on the e-mail Rosen sent Clerk during the investigation period, which e-mail was not listed as a basis for the demotion in the Chief's demotion letter. Rosen contends that this finding was in error and violated his due process rights.

¶16 We determine that although the Board acknowledged the e-mail evidence in its findings, it did not address the e-mail in its analysis or conclusion. Thus, Rosen's assertion that the Board improperly relied on the e-mail evidence is speculative, at best, and we do not address the issue further.

C. Sergeant Cole's Orders and Chief Hicken's January 28 Verbal Reprimand

¶17 Rosen challenges two particular findings made by the Board, arguing that those findings suggest that Sergeant Cole and Chief Hicken each instructed Rosen to have

only professional contact with Clerk one more time than they actually did. The Board's findings regarding Sergeant Cole's orders are as follows:

> 5. On or about January 19, 2011, a[n internal affairs] investigation was commenced regarding the pants incident . . . . Sgt. Kerry Cole was the investigating officer. Sgt. Cole testified that during his investigation, he informed Officer Rosen to have only "professional" contact with [Clerk].
>
> . . . .
>
> 8. Officer Rosen was again instructed by Sgt. Cole to stay away from [Clerk] and to leave her alone. He was instructed to give the situation time to cool off.

After the January 19 interview, Sergeant Cole did not meet with Rosen again until February 11, at which time he did repeat his professional contact order, but by that date, the acts amounting to insubordination (the circus ticket and River Dance incidents) had already occurred. Thus, we agree with Rosen that the Board's findings erroneously imply that Sergeant Cole instructed Rosen twice during the relevant time period to limit himself to only professional contact with Clerk, when he actually did so just once.

¶18    The Board's findings regarding Chief Hicken's orders are as follows:

> 9. On or about January 28, 2011, Chief Hicken met with Officer Rosen regarding the pants incident and . . . he verbally counseled Rosen and instructed him to limit his contact with [Clerk] to "professional" contact only. . . .
>
> . . . .
>
> 11. Chief Hicken testified that he met with Officer Rosen again on February 2, 2011 . . . . During the February 2, 2011 meeting, Chief Hicken instructed Officer Rosen . . . to have nothing but professional contact with [Clerk] . . . .

Again, Rosen's contention appears justified. On January 28, Chief Hicken issued his Verbal Reprimand, which consisted entirely of advising Rosen about preventing future wardrobe malfunctions and did not include a "'professional' contact only" order. Chief Hicken arranged his February 2 meeting with Rosen in light of the circus ticket incident and at that time issued his first "'professional' contact only" order to Rosen, which he repeated on February 7, after the River Dance incident. Therefore, the Board's findings are not supported by substantial evidence.

¶19 In light of these unsupported findings, the Board appeared to uphold Rosen's demotion for violating four "'professional' contact only" orders, rather than the two that were actually given. Accordingly, the Board's failure to make accurate "findings of fact in material issues renders its findings arbitrary and capricious," and because we can only guess as to whether the Board would have reached this same conclusion in light of the two orders that were actually given, we cannot say that these unsupported findings were harmless. *See Lucas v. Murray City Civil Serv. Comm'n*, 949 P.2d 746, 755 n.5 (Utah Ct. App. 1997) (citation and internal quotation marks omitted); *see also Adams v. Board of Review of the Indus. Comm'n*, 821 P.2d 1, 8 (Utah Ct. App. 1991) ("As a general rule, the appropriate relief for an agency's failure to make adequate findings is to vacate the order complained of and to order the agency to make more adequate findings in support of, and more fully articulate [the] reasons for, the determination . . . made." (alteration and omission in original) (citation and internal quotation marks omitted)). Therefore, we vacate the Board's decision and direct it to enter appropriate findings. *See generally Adams*, 821 P.2d at 8 ("[A]bsent adequate findings[,] there is no presumption that the Commission's decision is correct. The process of articulation may or may not cause the Commission to reach a different decision.").

II. Findings on Proportionality and Consistency

¶20 Next, Rosen argues that because the Board's ruling did not specifically address evidence presented regarding the history of disciplinary actions taken by the Police Department (the disciplinary evidence), the Board "failed to undertake one of its primary responsibilities, that of determining whether Rosen's discipline was 'appropriate and . . . proportionate to the offense.'" (Omission in original) (quoting *Salt Lake City Corp. v. Salt Lake City Civil Serv. Comm'n*, 908 P.2d 871, 876 (Utah Ct. App. 1995)). As a result, Rosen contends that the Board's decision is arbitrary and capricious. We disagree with Rosen's contention regarding the Board's proportionality findings,

determining that the Board's findings were sufficiently detailed to support its determination, albeit not an explicit determination, that Rosen's punishment was proportionate. However, we agree with Rosen's argument regarding the Board's consistency findings.

¶21    "[A]n administrative agency must make findings of fact that are sufficiently detailed so as to permit meaningful appellate review," which requires that the findings "include enough subsidiary facts to disclose the steps by which the ultimate conclusion on each factual issue was reached." *Lucas*, 949 P.2d at 755 n.5 (citation and internal quotation marks omitted). "The failure of an agency to make adequate findings of fact in material issues renders its findings arbitrary and capricious unless the evidence is clear, uncontroverted and capable of only one conclusion." *Id.* (citation and internal quotation marks omitted).

¶22    Regarding proportionality, the Board's decision stated, "The demotion of Officer Rosen from corporal to top step level police officer . . . is . . . upheld insofar as the decision was reasonable under the circumstances, and the discipline was warranted and supported by the evidence." The Board's findings detail the course of events from the pants-dropping incident through the internal affairs investigation, noting the repeated orders Rosen received from his superiors that he restrict his contact with Clerk to work-related matters and Rosen's apparent violation of those orders by way of the circus ticket and River Dance incidents. The Board noted that Rosen's decision to disregard the orders of his superior officers amounted to "insubordination, which is a serious offense," and that his "conduct created a significant disruption within the Department" and "illustrates his poor judgment, and an inability to lead others by his example." From these findings, we can ascertain that the Board considered Rosen's demotion to be a proportionate punishment for his actions. *See generally id.*

¶23    On the other hand, there is no indication from the Board's decision that it weighed any of the consistency evidence presented or that it even made an implied ruling regarding consistency. The relevant evidence presented indicates that forty-three internal investigations had been completed since the Police Department was established in 2007 and none of those investigations resulted in an employee being demoted. Most of the forty-three internal investigations resulted in verbal or written reprimands, although two investigations resulted in termination. At the hearing, Rosen introduced evidence of three previously disciplined officers who had received verbal reprimands

after failing to appear at court hearings or trials for which they were subpoenaed. Rosen asserted that these actions are "akin to insubordination," which he noted the Police Department's internal rules and regulations define as "the failure to follow a lawful order." (Internal quotation marks omitted.) Demotion has, however, been an option available to the Police Chief when disciplining employees, and Chief Hicken testified that "[i]n the history of the Saratoga Springs Police Department, . . . there [have not been] any[ incidents] factually comparable to what [he] dealt with [with Rosen] in this particular case," including no prior incidents in which "direct orders [had] been violated."

¶24    Although the Board did not make any specific findings or comment on the consistency evidence, its decision to uphold Rosen's demotion is not necessarily inconsistent therewith. Nonetheless, the Board's failure to make these findings deprives us of the ability to review its consistency determination. Accordingly, the Board is directed to enter additional findings regarding the issue of consistency.

### III. Adverse Inference

¶25    Rosen argues that the Board should have granted his motion for an adverse inference in light of the City's failure to provide him with the audio and video recording (the recording) of the January 19 interview that Rosen had with Sergeant Cole. Rosen contended that the Board should infer from the City's failure to produce the recording that Sergeant "Cole had not issued a 'professional contact only' order." The Board denied the motion, however, determining that the recording was not necessary because Sergeant Cole and Rosen could each testify as to their recollection of the orders given during the January 19 interview.

¶26    Rosen asserts that the Board's denial of his motion was in error because the policy considerations behind rule 37(i) of the Utah Rules of Civil Procedure[4] and rule 1002 of the Utah Rules of Evidence (the best evidence rule) should "apply equally to appeal board hearings," regardless of the fact that appeal boards are not bound by those

---

[4]Rule 37 of the Utah Rules of Civil Procedure was amended after the filing of this appeal. Because the changes to the provisions of the rule relevant to this case are not substantive, we cite the most recent version of the rule for the reader's convenience. *See* Utah R. Civ. P. 37 advisory committee's note.

rules in the first place, *see Lucas v. Murray City Civil Serv. Comm'n*, 949 P.2d 746, 755 (Utah Ct. App. 1997) ("[A] municipal administrative body . . . is not bound by formal rules of evidence and procedure."). *See generally* Utah R. Civ. P. 37(i) ("Nothing in this rule limits the inherent power of the court to take any action authorized by paragraph (e)(2) if a party destroys, conceals, alters, tampers with or fails to preserve a document, tangible item, electronic data or other evidence in violation of a duty."); *id.* R. 37(e)(2)–(e)(2)(A) ("Unless the court finds that the failure was substantially justified, the court in which the action is pending may impose appropriate sanctions for the failure to follow its orders, including . . . deem the matter or any other designated facts to be established in accordance with the claim or defense of the party obtaining the order . . . ."); Utah R. Evid. 1002 ("An original writing, recording, or photograph is required in order to prove its content, except as otherwise provided in these rules or by other rules adopted by the Supreme Court of this State or by statute."). Rosen explains that the adverse inference permitted by these rules provides a "'fair way to address the missing evidence'" and "'serve[s] the dual purpose of mitigating any prejudice experienced by [a party] and providing a sufficient deterrent to others who may be tempted to purposely destroy important evidence.'" (Quoting *Kilpatrick v. Bullough Abatement, Inc.*, 2008 UT 82, ¶ 39, 199 P.3d 957.)

¶27 Putting aside the fact that these rules do not apply in this municipal administrative setting, we are not convinced that the policy reasons behind these rules would be supported by adopting an adverse inference against the City. Rosen argues that an adverse inference in his favor would quell any prejudice against him in light of the City's failure to provide the recording. Yet Rosen's own prehearing statement appears to confirm Sergeant Cole's account that he instructed Rosen on January 19 to limit his contact with Clerk to professional matters. As the City put it, because Rosen's prehearing statement "mirrored the account of Sgt. Cole . . . , there was no dispute about the directive given Rosen at that meeting"; thus "the missing audio recording was irrelevant" and not prejudicial. Likewise, Rosen's assertion that the policy consideration of deterrence would be supported by application of an adverse inference here is unavailing. Neither Rosen nor the City could explain how, when, or by whom the recording was lost, and "multiple people, including Sergeant Cole, Officer Rosen, [and] the [C]hief" had access to it. Thus, we agree with the City's assertion that "punishing just one party does not fully deter the purposeful destruction of evidence" where in this case "either party may be responsible for losing or destroying the evidence, and there is no indication as to how the evidence was lost."

¶28    Additionally, even assuming rule 37 of the Utah Rules of Civil Procedure and the best evidence rule control here, neither would mandate the outcome Rosen seeks. Application of rule 37 is discretionary, *see, e.g.,* Utah R. Civ. P. 37(e)(2) ("[T]he court in which the action is pending *may* impose appropriate sanctions for the failure to follow its orders . . . ." (emphasis added)), and a reviewing court affords a great deal of deference to the exercise of that discretion, *cf. Kilpatrick*, 2008 UT 82, ¶ 23 (discussing the degree of deference afforded a trial court in selecting discovery sanctions).  For the Board's decision to deny Rosen's motion for an adverse inference to amount to an abuse of discretion, Rosen would have to demonstrate that the decision "exceeds the bounds of reasonableness and rationality."  *See Harmon v. Ogden City Civil Serv. Comm'n*, 2007 UT App 336, ¶ 6, 171 P.3d 474 (citation and internal quotation marks omitted).  Rosen has not done so; all Rosen has done is indicate that the City used to have the recording but no longer does, and then describe how an adverse inference would have been helpful to his case.

¶29    Likewise, the best evidence rule would not require admission of the recording over Sergeant Cole's and Rosen's testimonies where the disputed issue is not the contents of the recording, but the contents of the January 19 interview.

> The "best evidence" rule generally has come to denote only the requirement that the contents of an available written document[, recording, or photograph] be proved by introduction of the document[, recording, or photograph] itself.  It has no application to a case where a party seeks to prove a fact which has an existence independent of any writing[, recording, or photograph].

*Roods v. Roods*, 645 P.2d 640, 642 (Utah 1982) (determining that the best evidence rule was not implicated to require admission of a document that recorded the length of a mother's pregnancy because "[t]he mother's length of pregnancy is independent of any documentation" and a fact that could be established by the mother's testimony); *see also* Utah R. Evid. 1002 (describing the best evidence rule as applying to writings, recordings, or photographs); *Central Bank v. Holman* (*In re Ina C. Holman Family Trust*), 2008 UT App 120U, para. 6 (mem.) (concluding that the best evidence rule did not require admission of the document amending a revocable trust where the legal dispute involved "[w]hether there were problems surrounding the execution of the

[amendment] . . . independent of the contents of the [amendment] itself"). In other words, "[w]itness testimony adduced from personal experience or knowledge is not within the ambit of [the best evidence rule]; witnesses may freely testify about events which have occurred independently from and may have been memorialized by an antecedent writing[, recording, or photograph]." *Watkins v. Williams*, 877 P.2d 19, 22 (Mont. 1994). We agree with the City that because the content of the recording itself was not an issue before the Board, Rosen and Sergeant Cole could testify about the January 19 interview without implicating the best evidence rule.

## IV. Premature Review of the Evidence

¶30     Last, Rosen argues that the Board did not have authority to receive, a month before the hearing, a packet of proposed exhibits submitted by the City that included documents that were ultimately not admitted at the hearing. Rosen also argues that the Board's subsequent review of the packet before the hearing "tainted the hearing," as evidenced by comments made by Board members appearing in the transcript of the hearing prepared for this appeal, "and caused irreversible prejudice to Rosen." We do not address this argument because Rosen failed to preserve it for appeal.

¶31     "[I]n order to preserve an issue for appeal[,] the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue." *438 Main St. v. Easy Heat, Inc.*, 2004 UT 72, ¶ 51, 99 P.3d 801 (alterations in original) (citation and internal quotation marks omitted). The preservation rule applies in agency appeals "when the issue raised on appeal could have been resolved in the administrative setting." *ABCO Enters. v. Utah State Tax Comm'n*, 2009 UT 36, ¶¶ 10–11, 211 P.3d 382 (elaborating on scenarios in which the preservation rule applies in agency appeals); *see also In re Anderson*, 2004 UT 7, ¶ 47, 82 P.3d 1134 (per curiam) ("In agency appeals, . . . it is logical to require matters that may be dispositive to be presented in the first instance to the agency, so that it may consider them at the time of reaching its decision."). Rosen argues that he did not have the opportunity to preserve this argument because the allegedly prejudicial comments made by the Board occurred when both parties had left the room to allow the Board to deliberate on preliminary matters and Rosen did not discover the Board's prejudicial comments made behind closed doors until reviewing the transcript that was prepared for this appeal. He also argues that he could not have preserved his challenge to the Board's authority to receive

the exhibit packet in advance of the hearing because Utah Code section 10-3-1106 did not give the Board the authority to remedy the error had it been raised.

¶32    We are not persuaded by Rosen's arguments.  At the beginning of the hearing, Rosen's attorney asked the Board to confirm that it had received the City's exhibit packet a month prior to trial, but he did not raise any argument that, by doing so the Board exceeded its authority.  While Rosen may not have learned of the Board's alleged prejudicial comments until after the fact, he knew that the City's exhibit packet was delivered a month in advance and that the Board had reviewed it.  He could have thereby deduced that perhaps some members of the Board formed opinions about the issues before the hearing had occurred.  The hearing transcript prepared for this appeal, in other words, was not the first and only event that could have prompted Rosen to have and to raise these concerns.[5]  Likewise, Rosen's doubts about the Board's ability to have remedied the alleged errors itself does not relieve him of the requirement that he preserve the argument for appeal by first raising it to the Board.


CONCLUSION

¶33    Rosen did not preserve his argument challenging the Board's authority to accept and review the City's evidence in advance of his hearing, and he inadequately briefed his contention that he was prejudiced by the Board's review of that evidence.  The Board properly denied Rosen's motion for an adverse inference.  The Board's decision is nonetheless set aside in light of its unsupported determination that Rosen was given

---

[5]In this sense, Rosen's concern appears to be primarily that certain Board members formed opinions about his conduct that he suggests show bias.  As a legal matter, however, he has focused on the argument that the Board was not permitted by statute to receive and review any evidence before the hearing.  He raised no such objection at the hearing itself, instead appearing to welcome the fact that the Board already had a background understanding of the case.  Rosen does not address the issue of alleged bias as an independent argument on appeal.  Consequently, the bias issue is not adequately briefed.  *See* Utah R. App. P. 24(a)(9) (requiring an appellant's brief to "contain the contentions and reasons of the appellant with respect to the issues presented . . . with citations to the authorities, statutes, and parts of the record relied on").

four "'professional' contact only" orders and for its failure to make adequate findings regarding the consistency of Rosen's demotion with the evidence detailing the Police Department's disciplinary history. We direct the Board to revisit its findings in light of this opinion.

_____
James Z. Davis, Judge

-----

¶34     WE CONCUR:

_____
Stephen L. Roth, Judge

_____
Michele M. Christiansen, Judge