2010 UT App 51

**Jack GUENON, Petitioner,**

v.

**MIDVALE CITY, a Utah municipal corporation; and Midvale City Employee Appeals Board, Respondents.**

No. 20081043–CA.

Court of Appeals of Utah.

March 4, 2010.

Cloudrock's timeliness and materiality arguments are irrelevant.

Ryan B. Hancey, Salt Lake City, for Petitioner.

H. Craig Hall and Jennifer A. Brown, Salt Lake City, for Respondents.

Before Judges McHUGH, ORME, and BILLINGS.[1]

## MEMORANDUM DECISION

McHUGH, Associate Presiding Judge:

¶1 Midvale City Police Officer Jack Guenon appeals from the decision of the Midvale

---

1. The Honorable Judith M. Billings, Senior Judge, sat by special assignment pursuant to Utah Code section 78A–3–103(2) (2008) and rule 11–201(6) of the Utah Rules of Judicial Administration.

City Employee Appeals Board (the Board) that upheld Midvale City's (the City) decision to terminate Officer Guenon's employment with the Midvale City Police Department (the Department). We affirm.

¶ 2 In affirming the City's decision to terminate Officer Guenon's employment, the Board concluded that termination was proportionate to Officer Guenon's misconduct, based on its finding that Officer Guenon violated four of the Department's policies: (1) mishandling evidence, (2) theft or misappropriation of private property, (3) intentionally viewing pornography on his city-issued laptop, and (4) two acts of insubordination.[2]

¶ 3 To prevail on his appeal of that decision, Officer Guenon must show "either (1) that the facts do not support the action taken by [the City] or (2) that the charges do not warrant the sanction imposed." *Harmon v. Ogden City Civil Serv. Comm'n*, 2007 UT App 336, ¶ 6, 171 P.3d 474. Officer Guenon argues that the Board lacked substantial evidence to support its findings regarding some of the grounds for termination, that the acts of insubordination were protected by the Utah Protection of Public Employees Act (the Whistleblower Act), *see* Utah Code Ann. § 67–21–3(1)(a) (2008), and that the sanction of termination was disproportionate to his actions and "excessive in light of [his] exemplary record."

¶ 4 Relying solely "on the record of the . . . [B]oard," we review the Board's decision to "determin[e] if the . . . [B]oard abused its discretion or exceeded its authority." Utah Code Ann. § 10–3–1106(6)(c) (Supp.2009); *see also Harmon*, 2007 UT App 336, ¶ 6, 171 P.3d 474; *Kelly v. Salt Lake City Civil Serv. Comm'n*, 2000 UT App 235, ¶ 15, 8 P.3d 1048. Because the City's Chief of Police (the Chief) "is best able to balance the competing concerns in pursuing a particular disciplinary action," the Board was "required to give deference to the Chief." *Harmon*, 2007 UT App 336, ¶ 6, 171 P.3d 474 (internal quotation marks omitted). Accordingly, we will uphold the Board's "affirmance of the Chief's [decision to] terminat[e Officer Guenon] . . . unless it exceeds the bounds of reasonableness and rationality." *Id.* (internal quotation marks omitted).

¶ 5 Before turning to the merits of Officer Guenon's arguments on appeal, we first address the City's contention that Officer Guenon failed to marshal the evidence supporting the Board's decision. To challenge the Board's factual findings, Officer Guenon is required to "marshal all of the evidence supporting the findings and show that despite the supporting facts, and in light of the conflicting or contradictory evidence, the findings are not supported by substantial evidence." *Carter v. Labor Comm'n Appeals Bd.*, 2006 UT App 477, ¶ 12, 153 P.3d 763 (internal quotation marks omitted). Officer Guenon argues that the Board lacked substantial evidence to support its findings regarding the insubordination, theft or misappropriation, and pornography charges.[3]

¶ 6 After reviewing the record, we agree that Officer Guenon did not adequately marshal the evidence. Indeed, he omitted from his opening brief the following critical facts that support the Board's findings: That he admitted downloading potentially embarrassing photographs of two supervisors onto a CD in order to give "shit" to the individuals in the photographs, wrote "job security" on

---

2. The Board's findings were not included in the record on appeal but were attached as an addendum to Officer Guenon's opening brief. At oral argument, both parties agreed that the attached copy of the Board's findings is true and correct and that it should be supplemented to the record.

3. Officer Guenon also maintains that there is no evidence to support the Board's finding that he violated the Department's evidence policy. That contention is based on the undisputed testimony that it was a common practice for police officers to leave seized identification cards and other evidence in their patrol cars rather than checking them into evidence as required by Depart-

ment policy. As the City correctly notes, however, the fact that other officers may also have violated the policy is irrelevant to our analysis of whether substantial evidence in the record supports the Board's finding that Officer Guenon violated the policy. *See Ogden City Corp. v. Harmon*, 2005 UT App 274, ¶ 12, 116 P.3d 973 (holding "that a violation of department regulations is [not] justifiable merely because it is common" among the department's members and that the existence of such a common practice is "relevant only in that [it] may affect the degree of discipline imposed").

year term. Incumbent legislators therefore have no legal or moral right to complain that their terms are being foreshortened. Moreover, it would be grossly unfair for this Court to extend the terms of the present incumbents when there may well be individuals who decided not to run in 1982 for a one-year term. The greatest harm, however, would befall the citizens of Alabama, who would be forced to endure three additional years of representation by a malapportioned Legislature.

Because the parties are urging this Court to extend the terms of legislators elected under Act No. 82–629, an examination of its merits is necessary. In his letter of August 2, 1982, the Assistant Attorney General found that Act No. 82–629 violated Section 5 of the Voting Rights Act. We agree with his determination that the configuration of certain Black Belt districts caused retrogression of black voting strength (particularly in districts 45 and 88) and that there was unnecessary fragmentation of minority communities and insufficient adherence to county boundaries. Furthermore, we find that Act No. 82–629 is impermissible under Ala. Const. art. IX, §§ 198, 199 & 200 because of its disregard for the integrity of county lines. Boundaries of thirty counties were unnecessarily split by the plan. Implementation of such a plan for an entire legislative term is unacceptable.

Act No. 83–154, on the other hand, is an exemplary reapportionment plan. In the entire state there is not a single instance of dilution of the black vote. The plan conforms closely to county lines,[13] and population variances between districts are acceptable.[14] The plan appears to represent a genuine legislative concern for maintaining the integrity of various economic, political and racial communities. It also represents a concerted effort to minimize the number of contests between incumbents.[15] And though Act No. 83–154 is similar to plaintiffs' Plan B, which had been previously submitted to this Court, we find that it has been sufficiently modified to satisfy our concerns as to its racial neutrality. Under plaintiffs' Plan B, 33 of 92 white house members and 18 of 32 white senators would have had to run against each other, whereas under Act No. 83–154 only 9 white house members and 12 white senators must run against incumbents. Although none of the three black senators must run against an incumbent, there is no evidence that this result was achieved through racial gerrymandering. The three black senate incumbents are, under Act No. 83–154, included in compact, well-defined districts which did not require major revision from the previous plan. We agree with the parties that Act No. 83–154 violates neither the State nor the Federal Constitutions. And since reapportionment is primarily a matter for legislative consideration and determination, *White v. Weiser,* 412 U.S. 783, 795, 93 S.Ct. 2348, 2354, 37 L.Ed.2d 335 (1973), it is not within the province of this Court to comment on the wisdom of the various legislative decisions from which this plan evolved.

An additional reason exists for requiring elections this fall. Only a fine line marks the boundary between legislative reapportionment plans which are subject to Section 5 preclearance and judicial plans which are not. *See generally McDaniel v. Sanchez, supra,* 452 U.S. at 138–53, 101 S.Ct. at 2230–

---

13. Boundaries of no more than thirteen counties were split by Act 83–154.

14. The total deviation among the House districts is 10.86% and the total deviation in the Senate is 9.63%. In *Gaffney v. Cummings,* 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973), and *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), the Supreme Court held that total deviations of 10% or less would not make out a *prima facie* violation of the Equal Protection "one man, one vote" standard. Deviation of slightly more than 10% is justified when, as in this case, the disparity is

incidental to an important state interest such as conforming legislative districts to county lines, *Mahan v. Howell,* 410 U.S. 315, 321, 93 S.Ct. 979, 983, 35 L.Ed.2d 320 (1973), or minimizing the number of contests between present incumbents. *Burns v. Richardson,* 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966).

15. Act No. 83–154 has significantly reshaped legislative districting in Alabama. Nevertheless, only 12 of 35 incumbent senators and 9 of 105 incumbent house members are included, by the Act, in the same district with other incumbents.

38; *see also Upham v. Seamon, supra,* 456 U.S. at 42–44, 102 S.Ct. at 1521–22. It is our understanding that the only times reapportionment plans are not subject to Section 5 scrutiny are when a court "fashions the plan itself instead of relying on a plan presented by a litigant," *McDaniel, supra,* 452 U.S. at 148–49, 101 S.Ct. at 2235, or when a court is forced to implement an interim plan so that elections can be held. *See Upham, supra,* 456 U.S. at 44, 102 S.Ct. at 1522; *McDaniel, supra,* 452 U.S. at 153 n. 35, 101 S.Ct. at 2238 n. 35. We ordered the interim implementation of Act No. 82–629 even though the Act had not been precleared. We would not, however, have ordered implementation of Act No. 82–629 for an entire legislative term absent preclearance. Such an order was not necessitated and would essentially have effectuated a permanent plan formulated by a party to the litigation. To implement such a plan without requiring preclearance would encourage legislative delay and frustrate the purposes of the Voting Rights Act. *See McDaniel, supra,* 452 U.S. at 151, 101 S.Ct. at 2237.

Act No. 83–154 will be implemented by elections conducted this fall. We are ordering elections for the entire Alabama Legislature reluctantly; however, the parties will not be allowed to stipulate and agree to vacating the prior orders of this Court. We refuse to approve a settlement which would result in the continuation in office for four years of legislators who were not elected under a valid reapportionment plan. This Court has a solemn duty to relieve the citizens of this state from such deprivations of their legal rights. The Legislature of this state also has a solemn duty—to periodically reapportion itself according to state and federal law. *Sims v. Frink, supra,* 208 F.Supp. at 441–42. Yet, despite the repeated efforts of this Court, the Alabama Legislature has failed to enact a valid reapportionment plan for over eighty years. The day has finally arrived. The Legislature has finally fulfilled its obligation to the people of Alabama. But the Legislature will not be rewarded for assuming its responsibilities at the expense of the citizens of Alabama. Act No. 83–154 has dramatically changed the apportionment of Alabama. Ninety-six of the 105 House Districts and all of the 35 Senate Districts have been significantly altered by the Act. Were we to postpone elections under Act No. 83–154 until 1986, as requested by the parties, the utility of this plan would be vastly diminished. The Alabama citizens have a right to be represented as soon as practicable by a validly elected legislature. That right would be infringed if elections under a constitutional apportionment plan were postponed.

An appropriate order will be entered in accordance with the foregoing.

HOBBS, District Judge, concurring:

I fully concur in the Court's opinion, written by Judge Johnson, except that I am compelled to acknowledge that I did not make a determination as to whether Act No. 82–629 or Plaintiffs' Plan B had the deficiencies ascribed to them by the Court's opinion. I had insufficient time to study adequately either of these plans prior to this Court's decision of June 21, 1982. (As Judge Johnson's opinion points out, this Court's June 21 decision imposing an interim plan, was compelled by the necessity of election deadlines.) The action of the Attorney General of the United States in refusing to preclear Act No. 82–629 and the subsequent action of the Legislature in enacting Act No. 83–154, which meets all constitutional requirements and which has been precleared by the Attorney General of the United States, makes it unnecessary for me to analyze the merits of either Act No. 82–629 or Plaintiffs' Plan B.