**2013 UT App 69**

# THE UTAH COURT OF APPEALS

TAYLORSVILLE CITY, TAYLORSVILLE CITY POLICE DEPARTMENT,
AND TAYLORSVILLE POLICE CHIEF DEL CRAIG,

*Petitioners,*

*v.*

TAYLORSVILLE CITY EMPLOYEE APPEAL BOARD
AND OFFICER BRADLEY GILLESPIE,

*Respondents.*

Opinion
No. 20110546-CA
Filed March 14, 2013

Original Proceeding in this Court

Phillip W. Dyer, B. Kent Morgan, and Benjamin R. Dyer, Attorneys for Petitioners

Ryan B. Hancey, Attorney for
Respondent Officer Bradley Gillespie

JUDGE CAROLYN B. MCHUGH authored this Opinion,
in which JUDGES JAMES Z. DAVIS
and MICHELE M. CHRISTIANSEN concurred.

McHUGH, Judge:

¶1 Taylorsville City (the City) appeals from a decision by the Taylorsville City Employee Appeal Board (the Board) reversing the City's termination of Officer Bradley Gillespie from the Taylorsville City Police Department (the Department). We set aside the Board's decision and remand for proceedings consistent with this decision.

BACKGROUND

¶2 The Department hired Gillespie as a police officer on December 15, 2008, subject to a one-year probationary period. During that year, the Department provided Gillespie with monthly performance evaluations that indicated he "need[ed] improvement" in the exercise of judgment and in his decision-making. While still on probation, Gillespie entered a private home illegally and deployed his taser on a young female who resisted his attempts to enter. As a result, the Department provided Gillespie with a corrective action plan. Before Gillespie completed that plan, the Department removed him from probationary status and granted him merit employment status. Shortly thereafter, Gillespie deployed his taser on a handcuffed and restrained suspect and was disciplined for the use of excessive force in the form of a written reprimand and a ten-day suspension. While Gillespie's appeal of the excessive force discipline was pending, he was involved in a series of incidents that are the subject of this appeal.

¶3 The first incident involved a pornographic video that Gillespie had stored on his personally-owned cellular telephone (the pornography incident). The initial image of the video appeared in a one-half inch by one-half inch icon on the screen of his phone, and touching the icon immediately played the video in full-screen. While on duty sometime in the fall of 2010, Gillespie "briefly" showed the icon to another on-duty officer and explained that "it was . . . an act of oral sex." In October of 2010, while Gillespie was off duty but volunteering for canine training, he showed the icon to another officer.

¶4 The second incident occurred on November 21, 2010, while Gillespie was off duty and intoxicated at his home (the intoxication incident). At Gillespie's invitation, an on-duty Taylorsville police officer went to Gillespie's home and was joined by two other on-duty officers. According to one of the officers, Gillespie "was very intoxicated and jumped up on the hood of [the officer's police] car," denting it. Gillespie announced that he was car surfing. One

of the other officers administered a portable breath test to Gillespie, which registered an alcohol concentration of .198 grams.[1]

¶5     Based on these allegations, the Taylorsville Police Chief (the Police Chief) initiated an internal affairs (IA) investigation. An IA investigator (the Investigator) interviewed the other officers involved in both incidents and then called Gillespie and told him to report for an interview the next day. Upon Gillespie's inquiry, the Investigator revealed that the investigation concerned the intoxication incident, but he did not mention the pornography incident.

¶6     Immediately before the interview the following day, the Investigator provided Gillespie with two documents to read and sign. The first was a copy of the Department's policy 2-5-02.08 on "member questioning," which provides that "[m]embers are required to answer accurately and completely, all questions about official duties directed to them by superiors and other authorized members. Failure to do so may subject the member to appropriate disciplinary action, including termination, for insubordination and/or misrepresentation." The second document was an IA investigation notice, which indicated that Gillespie was charged with violating "[s]tandards of conduct," that he had "an obligation under [policy] 2-5-02.08 . . . to answer accurately and completely all questions about official duties," and that "[r]efusal to do so is grounds for . . . termination." Gillespie signed the notice and the copy of policy 2-5-02.08 and acknowledged that he had read and understood both documents. The Investigator then proceeded with the interview.

_____

1. For comparison, under Utah law, a "blood or breath alcohol concentration of .08 grams or greater" is over the legal limit, rendering a person unable to drive legally. *See* Utah Code Ann. § 41-6a-502(1)(a) (LexisNexis 2010).

¶7      With respect to the intoxication incident, Gillespie initially stated that he "kinda leaned up against [another o]fficer's car and then leaned back," "sitting on [the] trunk." He acknowledged that he mentioned car surfing but said he meant the comment as a joke. Gillespie also claimed to have consumed only "two or three" alcoholic beverages prior to the incident and that he had inspected the vehicle for damage that night and found none. Later in the interview, however, Gillespie conceded that he probably stood on the police car and also admitted to drinking heavily.

¶8      When questioned about the pornography incident, Gillespie first denied that he had such a video on his cellular telephone but later only denied showing it to other officers. After further questioning, which included information about the statements given by other officers, Gillespie admitted that two officers saw the pornographic icon and that he had deleted it from his phone two or three days before the interview. He also admitted that he had offered to show the image to another officer who had declined to view it.

¶9      Based on the interviews of Gillespie and the other officers, the Investigator reported that there was substantiated evidence that Gillespie had damaged the patrol vehicle while off duty and intoxicated, and that Gillespie had shown other officers a porno-graphic image. The Investigator also indicated that Gillespie dishonestly answered some of the questions during the interview. As a result, the Investigator concluded that Gillespie had violated several Department policies. The Investigator recommended that Gillespie receive a written warning for the intoxication incident, that he receive forty hours of leave without pay for showing the pornographic image to other officers, and that he "be terminated for not being truthful in the [IA] investigation." The Investigator reasoned that termination was appropriate because Gillespie's dishonesty could be used to impeach his credibility if he were called to testify against a criminal defendant. The assistant police chief agreed that Gillespie should be terminated for dishonesty.

¶10    After reviewing the report, the Police Chief provided Gillespie with a written "Notice of Intent to Impose Termination," which stated that Gillespie was subject to termination for "Misrepresentation and Obstructing an IA Investigation," lack of "Attention to Duty," and "Private Life, Public Discredit, Equipment Damage." The notification also advised Gillespie of his right to appeal. The Police Chief then met with Gillespie and his attorney and later reviewed Gillespie's written statement in mitigation. Ultimately, the Police Chief terminated Gillespie's employment with the Department. Gillespie appealed to the Board.

¶11    After briefing and a hearing, the Board held that the City had improperly terminated Gillespie. It first determined that Gillespie did not violate the Department policies requiring him to be attentive to his duties by displaying the pornographic image. The Board reasoned that Gillespie had displayed the image during "down time" and that it therefore did not result in any neglect of police work. Next, the Board ruled that Gillespie did not "embarrass himself or the Department" by showing the image to other officers. In reaching that conclusion, the Board interpreted the Department's policy as prohibiting only "actions . . . that discredit[] the officer or the Department in the eyes of members of the public." Where Gillespie never showed the image to a member of the public, the Board ruled that he had not violated Department policy. The Board also noted that although the City's witnesses testified that it had "zero tolerance for pornography," the City's written anti-pornography policy extended only to city-owned devices. As a result, the Board concluded that the policy did not prohibit Gillespie's possession of pornography on his personally-owned cellular telephone.

¶12    With respect to the dishonesty charges, the Board stated that Department policy required Gillespie to answer questions about his official duties "accurately and completely" and explained that Gillespie "would violate [s]ection 2-2-04.05 of the Department [p]olicies if in an [IA] investigation he failed to accept responsibility for his actions by attempting to conceal, divert or mitigate his

culpability." The Board then found that during the interview, Gillespie "denied several times that he had shown an[ image] of the sexual act on his cell phone to other officers" and "failed to fully disclose . . . the reason for his lack of recall" about the intoxication incident, "which he later acknowledged to be due in part to his intoxication." Additionally, the Board found that Gillespie's "assertion that he checked the hood of [the police] car for damage that night lacks credibility and was an effort to mitigate his responsibility." Thus, the Board concluded that "this conduct in the interview violated [s]ection 2-5-2.08(1) and [s]ection 2-2-04.05 of the Department [p]olicies."

¶13    Nevertheless, the Board determined that termination for dishonesty related to the pornography incident was not appropriate because Gillespie was not notified that the investigation would include those allegations. The Board noted that Gillespie answered truthfully about the pornography incident "after becoming fully aware from the questioning that this was part of the investigation."

¶14    As to the intoxication incident, the Board determined that Gillespie had actual notice of the investigation and that therefore any deficiency in the written notice with regard to that charge was harmless. However, the Board found that there was insufficient evidence that Gillespie had damaged the police vehicle. The Board also decided that because the conduct "did not involve [Gillespie's] public safety duties," terminating him for dishonesty with regard to that conduct was not merited. As a result, the Board reversed the Police Chief's termination of Gillespie. The City now appeals.

ISSUES AND STANDARDS OF REVIEW

¶15    The City first argues that the Board either abused its discretion or acted arbitrarily and capriciously in applying a "more

expansive standard of review" than the "substantial evidence" standard. In particular, the City contends that the Board erred in failing to afford any deference to the Department's interpretation of its own policies. The City next argues that the Board abused its discretion in overturning the decision to terminate Gillespie because Gillespie failed to show that termination was a disproportionate sanction. Finally, the City argues that the Board erred by concluding that Gillespie had a due process right to notice of the charges against him at the investigative stage.

¶16 Our review of the Board's decision is "on the record of the appeal board" and is limited to determining whether the Board "abused its discretion or exceeded its authority." *See* Utah Code Ann. § 10-3-1106(6)(c) (LexisNexis 2012);[2] *Howick v. Salt Lake City Emp. Appeals Bd.*, 2009 UT App 334, ¶ 4, 222 P.3d 763. "We will uphold the Board's decision unless it exceeds the bounds of reasonableness and rationality." *Rosen v. Saratoga Springs City*, 2012 UT App 291, ¶ 8, 288 P.3d 606 (citation and internal quotation marks omitted). However, to the extent that the Board's decision implicates due process, we review it for correctness. *See id.*; *accord Fierro v. Park City Mun. Corp.*, 2012 UT App 304, ¶ 8 ("Due process challenges . . . are questions of general law and we give no deference to the agency's determination of what constitutes due process[.]" (alterations in original) (citation and internal quotation marks omitted)). Likewise, when "reviewing [the Board's] interpretations of general questions of law, this [c]ourt applies a correction-of-error standard, with no deference to the expertise of the [Board]." *Cf. Allen v. Department of Workforce Servs.*, 2005 UT App 186, ¶ 6, 112 P.3d 1238.

---

2. Because the 2012 amendment to the relevant section of the Utah Code does not impact our analysis, we cite the current version for the convenience of the reader.

ANALYSIS

I. The Board's Standard of Review

¶17    The City first argues that the Board exceeded its discretion by setting its own standard of review. Although the Board did not define this "more expansive" standard, it appears to have afforded no deference to the Police Chief's interpretation of Department policies or his reasoning that Gillespie's dishonesty in the interview could be used to impeach his credibility if he were called as a witness during a future criminal trial. Because the City's authority to create an appeal board is based in statute, we begin our analysis of this issue by examining that legislation. "Our primary objective in interpreting a statute is to give effect to the intent of the legislature." *In re J.M.S.*, 2011 UT 75, ¶ 13, 280 P.3d 410. The best evidence of that intent is the plain language of the statute. *See Summit Operating, LLC v. State Tax Comm'n*, 2012 UT 91, ¶ 11, 293 P.3d 369.

¶18    In Utah's Municipal Code, the Utah Legislature has delegated certain duties to municipal governments, including the initial review of discharge, suspension, and involuntary transfer involving municipal employees. *See* Utah Code Ann. §§ 10-3-1105 to -1106 (LexisNexis 2012). In particular, the legislature has authorized municipalities to create an appeal board or appoint a hearing officer to hear appeals from merit employees who have been terminated. *See id.* § 10-3-1106. Included in that authority is the right of "the governing body of each municipality by ordinance" to prescribe "the standard of review" to be applied by the appeal board in reviewing the municipality's termination decisions. *See id.* § 10-3-1106(7)(a). Despite this authority, the City had not adopted an ordinance setting the standard of review prior to the Board's decision reversing Gillespie's termination.[3]

---

3. The City enacted an ordinance that established a "substantial evidence" standard of review for the Board on March 21, 2012, after

(continued...)

¶19    The Board concluded that in the absence of action by the City, it could set its own standard of review. The City contends that the Board exceeded its discretion in doing so. In response, Gillespie claims that because the City failed to act, the Board "was free to apply whatever standard of review it believed was most appropriate."

¶20    Although the Utah Legislature has indicated that cities may prescribe the standard of review to be applied by their employee appeal boards, nothing in the statute addresses the standard of review applicable in the absence of a such an ordinance. *See id.* §§ 10-3-1105 to -1106. Likewise, there is nothing in sections 10-3-1105 or 10-3-1106 that grants an appeal board the authority to set its own standard of review. *See id.; cf. Pearson v. South Jordan Emp. Appeals Bd.*, 2009 UT App 204, ¶ 14, 216 P.3d 996 ("[T]he only authority granted by the legislature is contained in section 10-3-1106, which authorizes the Board to determine the cause of the merit employee's discharge, suspension, or transfer."). Instead, the plain language of the statute grants that authority to the "governing body of each municipality." *See* Utah Code Ann. § 10-3-1106(7)(a); s*ee also Mountain States Tel. & Tel. Co. v. Atkin, Wright & Miles, Chartered*, 681 P.2d 1258, 1263 (Utah 1984) ("Virtually all authorities hold [that] when authority is delegated to an administrative officer or body, such delegation within its terms and limitations is *primary and exclusive* unless a contrary intent is clearly manifested by the legislature."). The Utah Municipal Code defines "[g]overning body" as "collectively the legislative body and the executive of any municipality," and further indicates that "in a city of the third, fourth, or fifth class, the governing body is the city council." *See* Utah Code Ann. § 10-1-104(3)(b) (LexisNexis 2012).

---

3. (...continued)
the events that resulted in this petition for review. *See* Taylorsville, Utah, City Code § 2.28.080.

The City is a city of the third class.[4] Thus, the Board is not the "governing body" of the City and it exceeded its authority by adopting its own "more expansive" standard of review.

¶21    Because the City did not act and the Board was not authorized to do so, we now consider what standard of review applies when a municipality fails to exercise the authority granted by the Utah Legislature. Although we look first to the plain language of the statute, often "statutory text may not be plain when read in isolation, but may become so in light of its linguistic, structural, and statutory context." *In re J.M.S.*, 2011 UT 75, ¶ 13 (citation and internal quotation marks omitted). Therefore, "our interpretation of a statute requires that each part or section be construed in connection with every other part or section so as to produce a harmonious whole." *Id.* (citation and internal quotation marks omitted). Here, our analysis is complicated by the statute's silence with respect to the default standard of review.

¶22    In *Associated General Contractors v. Board of Oil, Gas & Mining*, 2001 UT 112, 38 P.3d 291, the Utah Supreme Court considered a similar issue. There, an association of general contractors challenged rules adopted by the Board of Oil, Gas, and Mining (the OGM Board) in the district court. *Id*. ¶¶ 1, 11. The Utah Administrative Rulemaking Act was silent on the appropriate standard of review, and each party urged a different standard. *Id.* ¶¶ 15–16. In

---

4. The class of a city is determined by its population. A third class city has a population of 30,000 or more but less than 65,000. *See* Utah Code Ann. § 10-2-301 (LexisNexis 2012). Although the population of the City was not included in the record, in order to determine what class the City is, this court has the "discretion to take judicial notice of a fact 'not subject to reasonable dispute' because the fact is 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" *See Finlayson v. Finlayson*, 874 P.2d 843, 847 (Utah Ct. App. 1994) (quoting Utah R. Evid. 201(b)).

reaching its decision upholding the rules, the district court applied a substantial evidence standard, concluding that "the rule should be upheld if the quantum and quality of evidence the [OGM] Board relied upon was adequate to convince a reasonable mind to support [the agency's] conclusion." *Id.* ¶ 22 (second alteration in original) (citation and internal quotation marks omitted).

¶23    On appeal, the supreme court upheld the district court's decision, stating, "[i]f a statute is silent as to what standards of review apply under its provisions, . . . we employ the applicable standards of review as previously enunciated by our decisional law." *Id.* ¶ 17. The supreme court further indicated that the applicable standard of review is dependent upon the nature of the particular challenge. *Id*. ¶ 19. With respect to the contractors' claim that the OGM Board misinterpreted the operative terms of the rules, the supreme court deferred to that agency's expertise, adopting a standard of "arbitrariness and capriciousness." *Id.* Next, the court considered the contractors' claim that the rules were not based on substantial evidence. *Id.* ¶ 20. *See generally* Utah Code Ann. § 63G-3-602(4)(a)(ii) (LexisNexis 2011) (identifying as a ground for declaring a rule invalid situations in which "the rule is not supported by substantial evidence when viewed in light of the whole administrative record"). Because it viewed the substantial evidence challenge as injecting adjudicatory concepts of evidentiary proof into the realm of rulemaking, the court applied the standard of review outlined in previous cases under the Administrative Procedures Act. *See Associated Gen. Contractors*, 2001 UT 112, ¶ 21; *see also* Utah Code Ann. §§ 63G-4-101 to -601 (2011 & Supp. 2012). It held that "in determining whether a rule is supported by substantial evidence, courts must decide if the relevant findings were 'reasonable and rational,' although such an assessment 'does not constitute a de novo review or a reweighing of the evidence.'" *Id.* (quoting *Larson Limestone Co. v. State, Div. of Oil, Gas & Mining*, 903 P.2d 429, 430–31 (Utah 1995)).

¶24 Although the present case involves a challenge to the standard of review applied by the Board, rather than a district court, we consider the reasoning of *Associated General Contractors* instructive. Accordingly, we look to both the nature of the challenge to the Board's ruling and our decisional law for guidance. We begin with an examination of our precedent.

¶25 In addition to the provisions governing appeal boards, the Utah Municipal Code authorizes the establishment of civil service commissions. *See* Utah Code Ann. § 10-3-1003 (2012). These commissions serve a role similar to employee appeal boards, but they review the termination of employees of police and fire departments of first and second class cities. *See id*. §§ 10-3-1001 to -1012. Like employee appeal boards, civil service commissions "shall fully hear and determine the matter" when an employee appeals a termination decision of the department. *See id.* § 10-3-1012(2) (civil service commission); *id.* § 10-3-1106(3)(b)(ii) (employee appeal board). However, unlike appeal boards, the Utah Legislature has not granted cities the authority to establish a standard of review for civil service commissions. *Compare id.* § 10-3-1106(7)(a) ("[T]he procedure for conducting an appeal [before the appeal board] and the standard of review shall be prescribed by the governing body of each municipality by ordinance."), *with id*. §§ 10-3-1001 to -1012 (containing no similar provision). Accordingly, the civil service commissions are in a posture much like an appeal board in a city that has not adopted a standard of review.

¶26 Decisions from our appellate courts have explained that the proper role of a civil service commission is to address two questions: "'(1) do the facts support the charges made by the department head, and, if so, (2) do the charges warrant the sanction imposed?'" *Kelly v. Salt Lake City Civil Serv. Comm'n*, 2000 UT App 235, ¶ 16, 8 P.3d 1048 (quoting *In re Discharge of Jones*, 720 P.2d 1356, 1361 (Utah 1986)). Here, the Board ruled that the facts did support the dishonesty charges, concluding that Gillespie's conduct during the interview violated Department policy regarding

truthfulness and candor. Thus, we consider only the second issue—the Board's determination that the dishonesty charges did not warrant termination.

¶27    This second inquiry "is a limited one" because "[t]he [Police Chief] must manage and direct his deputies, and is in the best position to know whether their actions merit discipline." *See In re Discharge of Jones*, 720 P.2d at 1363. Accordingly, if the facts support the charges, the Board "must affirm the [Police Chief's] disciplinary action, unless it finds the sanction so clearly disproportionate to the charges as to amount to an abuse of the [Police Chief's] discretion." *See id.*

¶28    More recently, in *Harmon v. Ogden City Civil Service Commission*, 2007 UT App 336, 171 P.3d 474, this court stated, "In determining whether the sanction of dismissal is warranted . . . , the [c]ommission *must affirm* the sanction if it is (1) appropriate to the offense and (2) consistent with previous sanctions imposed by the department." *Id.* ¶ 8 (emphasis added) (citation and internal quotation marks omitted). In making that assessment, the civil service commission must grant appropriate deference to the police chief. *Id*. ¶ 6 ("The commission is required to give deference to the [police c]hief, as he is best able to balance the competing concerns in pursuing a particular disciplinary action." (citation and internal quotation marks omitted)); *Kelly*, 2000 UT App 235, ¶ 22 ("[D]iscipline imposed for employee misconduct is within the sound discretion of the [police c]hief."). However, that deference is not unlimited. The court in *Kelly v. Salt Lake City Civil Service Commission*, 2000 UT App 235, 8 P.3d 1048, noted that while we "proceed cautiously, so as not to undermine the [police c]hief's authority," a police chief "exceeds the scope of his discretion if the punishment imposed is in excess of 'the range of sanctions permitted by statute or regulation, or if, in light of all the circumstances, the punishment is disproportionate to the offense.'" *Id.* (quoting *Lucas v. Murray City Civil Serv. Comm'n*, 949 P.2d 746, 761 (Utah Ct. App. 1997)).

¶29 This review of our decisional authority indicates that a civil service commission should give deference to a police chief's advantaged position in considering whether the sanction selected by the police chief is warranted, and that the standard of review is substantial evidence with respect to findings of fact and abuse of discretion with respect to the discipline selected. In the absence of a city ordinance expressly rejecting this approach, we are convinced that the same standard applies here. *See generally Rosen v. Saratoga Springs City*, 2012 UT App 291, ¶ 8, 288 P.3d 606 (citing *Lucas* and applying substantial evidence review in considering a challenge to findings made by an employee appeal board); *Guenon v. Midvale City*, 2010 UT App 51, ¶ 4, 230 P.3d 1032 (mem.) (applying the reasoning of civil service commission cases to an appeal board governed by Utah Code section 10-3-1106); *Kelly*, 2000 UT App 235, ¶ 24 (applying the abuse of discretion standard to the review of discipline imposed). Accordingly, the Board exceeded its discretion by adopting a different standard of review. In section III, *infra* ¶¶ 41–48, we address whether the use of that standard affected the Board's assessment of the appropriateness of Gillespie's termination.

## II. Notice

¶30 We next consider the City's claim that the Board exceeded its discretion by holding that Gillespie did not have adequate notice of the charges against him. According to the City, the Board violated the City's due process rights by considering on its own motion whether Gillespie's due process rights were violated by the inadequate notice of the investigation's scope. The City contends that because Gillespie did not raise the issue, the Board's consideration of it deprived the City of the "opportunity to be heard in a meaningful way." *See generally Dairy Prod. Servs., Inc. v. City of Wellsville*, 2000 UT 81, ¶ 49, 13 P.3d 581. Gillespie responds that the Board's decision was not based on his due process rights but limited to the interpretation of the Department's own policy, which was clearly at issue.

¶31    In reversing the Police Chief's termination of Gillespie's employment, the Board reasoned that the Department had failed to give Gillespie the notice required by Department policy 2-5-02.03(5) (the Notice Policy), which provides, "Prior to any formal interview of an accused member as part of an [IA] Investigation, members will be given written notification of the allegations and informed of their rights and responsibilities relative to the investigation in accordance with the Member Questioning Policy."

¶32    Interpreting the Notice Policy, the Board stated, "Gillespie did not receive the Notification Form until he sat down with the [Investigator] for the interview. We do not believe that immediately prior to the beginning of the interview is prior notice as required by this policy." It further indicated that even if the written notice presented to Gillespie on the day of the interview could be considered timely, the notice was deficient because it merely stated that the investigation involved "[s]tandards of conduct" and did not outline the specific allegations against Gillespie. The Board explained that "use of the word 'allegations' in the policy requires the Notification Form to list in general terms the factual allegations being investigated so that the officer can properly prepare for the interview." The Board then concluded that the Department failed to comply with its own Notice Policy and, in doing so, "failed to provide the due process to which Gillespie was entitled."

¶33    Despite the Board's single reference to "due process," we agree with Gillespie that the basis of its decision was the City's failure to comply with its own Notice Policy and not the concept of constitutional due process. The Board does not reference either the Utah Constitution or United States Constitution, or address any of the legal concepts traditionally associated with the deprivation of constitutional due process. *See Lucas v. Murray City Civil Serv. Comm'n*, 949 P.2d 746, 754 (Utah Ct. App. 1997) (holding that failure to provide notice required under department policy did not deprive an officer of due process because he had actual notice of

the excessive force charge being investigated and was provided an opportunity to be heard before he was terminated). Instead, the focus of the Board's analysis is on the City's failure to give Gillespie written notice of the allegations, as required by the Department's Notice Policy. We therefore reject the City's contention that the Board violated the City's due process rights by introducing a due process argument on behalf of Gillespie.

A. Interpretation of the Notice Policy

¶34    We next consider the City's alternative argument that the Board was required to interpret the Department's Notice Policy consistently with Department practices. "In disciplinary proceedings, a public body must comply with its own rules and an employee being disciplined is entitled to rely upon those rules." *Id.* at 754. The City contends that the Department complied with the Notice Policy. In support, it relies on the testimony from the Police Chief indicating that the notice was a standard document used in IA investigations since at least 2006, and testimony from the Investigator that the Department's standard procedure is to provide the notice immediately prior to an IA interview. Even accepting that these practices reflect the Police Chief's interpretation of the Department's Notice Policy, that interpretation is entitled to deference only if it is reasonable. *See Westside Dixon Assocs., LLC v. Utah Power & Light Co./PacifiCorp*, 2002 UT 31, ¶ 7, 44 P.3d 775 (holding that the court applies an intermediate standard of review when considering an agency's interpretation of its own rules, "deferring to an agency's interpretation as long as it is both reasonable and rational"). Here, the Department's interpretation of its Notice Policy is not reasonable or rational.

¶35    First, the Notice Policy uses precise language, indicating that the officer must be given "written notification of the allegations" prior to the IA Investigation. We agree with the Board that "allegations" requires something more than a vague reference to "policy violations." *See Black's Law Dictionary* (9th ed. 2009)

(defining "allegation" as "a party's formal statement of a factual matter as being true or provable"). Second, the requirement that the notice of the allegations be provided to the officer "prior to any formal interview" should be interpreted in a manner that renders the Notice Policy meaningful. *Cf. Fierro v. Park City Mun. Corp.*, 2012 UT App 304, ¶ 16 ("It would be illogical for the statute to explicitly require a municipality to establish an appeal process through which an employee has an opportunity to refute the allegations against him, and yet view it as not requiring that the city give that employee clear notice of the allegations he should be prepared to address."). The Department's practice of providing written notice to an officer who is the subject of an IA investigation at the time the officer arrives for the formal interview serves little to no purpose and is therefore unreasonable. Accordingly, the Board was free to reject the Police Chief's interpretation of the Notice Policy, and we do not disturb its conclusion that the City failed to comply with it.

B. The Harmfulness of the Inadequate Notice

¶36    Despite that conclusion, the Board found that Gillespie had actual notice that he would be questioned about the intoxication incident. *See Lucas*, 949 P.2d at 750, 754 (holding that actual notice was sufficient despite failure to give the officer written notice of the charges against him as required by a policy identical to the City's); *see also Yardley v. Department of Corr.*, 2006 UT App 49U, paras. 6–7 (mem.) (holding that the correction department's failure to follow its own procedures and use a committee review of termination was harmless where the petitioner's pretermination hearing "reviewed the same issues that would have been covered by the committee review" and the petitioner did not contest the factual allegations against him). Gillespie does not challenge that finding, or any other findings, on appeal. Accordingly, the City's failure to provide written notice of the allegations regarding the intoxication incident prior to the interview was harmless.

¶37    However, there is no indication in the record that Gillespie had actual notice that the IA interview would include questions about the pornography incident. The City argues that this was harmless because, while Gillespie may not have known that he would be questioned about the pornography incident, he had ample notice that he could be terminated if he failed to answer all questions "accurately and completely."[5] Although Gillespie claims that he was dishonest because he "was caught off guard" by the questioning about the pornography incident, he admitted that prior to the IA interview, he knew he could be fired for giving inaccurate, false, or misleading answers to *any* questions.

¶38    The City also notes that an overly restrictive interpretation of the Notice Policy would limit the Department's disciplinary authority to offenses it is aware of prior to the investigation. Under the Board's interpretation, if an officer revealed information indicating inappropriate conduct of which the Department was unaware before the interview, the officer would be immune from disciplinary action. We agree that this interpretation is unreasonable. Even if the failure to notify Gillespie that he would be questioned about the pornography incident could protect him from discipline regarding that incident—an issue we do not decide—it would not prevent the Department from disciplining

---

5. The City also contends that the fundamental requirements of due process were met because the "Notice of Intent to Impose Termination" included detailed information about the allegations against Gillespie. *See Lucas v. Murray City Civil Serv. Comm'n*, 949 P.2d 746, 754 (Utah Ct. App. 1997). The City also notes that Gillespie and his attorney met with the Police Chief prior to Gillespie's termination and then sent the Police Chief a statement in mitigation. As discussed, however, the Board's decision was based on the Department's failure to follow its own Notice Policy, not on a violation of due process. While due process sets the minimum notice requirements, the City adopted a policy providing more protection to the members of its police force.

him for violations it could not have notified Gillespie about because they had not yet occurred or because the Department was unaware of them. Accordingly, we hold that Gillespie had sufficient notice prior to the interview that he could be disciplined for dishonesty.

¶39 Additionally, the Board determined that Gillespie was equally untruthful and evasive when answering questions about the intoxication incident despite actual knowledge of that investigation.[6] The Board concluded that Gillespie "failed to fully disclose . . . the reason for his lack of recall about the incident . . . , which he later acknowledged to be due in part to his intoxication." The Board also determined that Gillespie's claim that he "checked the hood of [another officer's] car for damage that night lacks credibility and was an effort to mitigate his responsibility." Thus, even when Gillespie had actual notice of the subject matter of the IA investigation, he answered dishonestly.

¶40 We therefore hold that the Board exceeded its discretion when it determined that any error in the notice provided to Gillespie was harmful in such a way that it warranted reversing the Police Chief's decision to terminate Gillespie's employment.

---

6. Department policy 2.2-02.04, which is related to member questioning, states that officers must answer "accurately and completely all questions about official duties." Policy 2.2-02.04 further clarifies that "[a]ny act or omission with the intent to hinder, prevent, delay, or interfere with an IA complaint investigation is a breach of discipline." Additionally, policy 2-2-04.05 indicates that "failure to cooperate fully in any internal administrative investigation . . . or failing to provide complete and accurate information in regard to *any* issue under investigation" constitutes dereliction of duty, as does "[f]ailure to accept responsibility for the member's actions by attempting to conceal, divert, or mitigate their true culpability."

III. The Appropriateness of Termination

¶41     The City also argues that the Board abused its discretion when it determined that, although Gillespie violated Department policies with his evasive and dishonest answers during the investigation, this conduct did not merit termination. As discussed, the Board was required to uphold the Police Chief's decision if termination was "(1) appropriate to the offense and (2) consistent with previous sanctions imposed by the department." *See Harmon v. Ogden City Civil Serv. Comm'n*, 2007 UT App 336, ¶ 8, 171 P.3d 474 (citation and internal quotation marks omitted).

A. Proportionality of the Sanction to the Offense

¶42     We first consider the Board's decision that termination was not an appropriate sanction for Gillespie's dishonesty. The Department's discipline policy states,

> In determining the type and severity of the disciplinary action, the [Police] Chief . . . shall consider aggravating and mitigating circumstances which include, but are not limited to, the repeated nature of the misconduct; prior disciplinary action imposed; the severity of the misconduct; the employee's work record; the effect on the . . . Department and the City's operations; and/or the potential of the misconduct to harm person(s) or property and information presented by the employee as a result of the pre-disciplinary hearing.

The policy is consistent with authority from this court. In *Nelson v. Orem City, Department of Public Safety*, 2012 UT App 147, 278 P.3d 1089, *cert. granted*, 288 P.3d 1045 (Utah 2012), this court identified several factors relevant to the issue of whether a sanction is proportional to the misconduct, stating,

> [E]xemplary performance by an employee may serve as evidence against termination, while job violations and continued misbehavior could weigh in favor of dismissal. The Board may also consider the following factors: (a) whether the violation is directly related to the employee's official duties and significantly impedes his or her ability to carry out those duties; (b) whether the offense was a type that adversely affects the public confidence in the department; (c) whether the offense undermines the morale and effectiveness of the department; or (d) whether the offense was committed willfully or knowingly, rather than negligently or inadvertently.

*Id.* ¶ 23 (alteration in original) (citations and internal quotation marks omitted). According to the City, Gillespie failed to provide any evidence on these factors and therefore did not meet his burden of establishing that termination was a disproportionate sanction.

¶43 Although the Board concluded that termination was not merited based on Gillespie's dishonesty, it did not specifically address these factors. Most troubling is the Board's failure to consider the Police Chief's concern that Gillespie would not be a credible witness in future criminal trials due to his dishonesty in the IA interview. *See generally Giglio v. United States*, 405 U.S. 150, 154 (1972) (holding that prior false testimony by a witness must be disclosed to the defense "[w]hen the reliability of a given witness may well be determinative of guilt or innocence" (citation and internal quotation marks omitted)); *cf. Tolman v. Salt Lake Cnty. Attorney*, 818 P.2d 23, 32 (Utah Ct. App. 1991) (holding that the county's career services council abused its discretion by failing to address a party's legal contentions "because it prevented the [career services council] from properly performing its review of the . . . decision to terminate [his] employment"). In addition, the Board's decision does not reflect any deference to the Police Chief's

advantaged position to evaluate the level of appropriate discipline. *See In re Discharge of Jones*, 720 P.2d 1356, 1363 (Utah 1986). We have previously instructed that "police officers are in a position of trust and are thus held to the highest standards of behavior." *Lucas v. Murray City Civil Serv. Comm'n*, 949 P.2d 746, 762 (Utah Ct. App. 1997) (citation and internal quotation marks omitted). Because "[h]onesty and credibility are crucial to [a police officer's] proper performance of his [or her] duties," we have held that a police chief has discretion to terminate an officer in cases involving dishonesty. *See id.* (second and third alterations in original) (citation and internal quotation marks omitted).

¶44  Instead, the Board's focus was on the underlying pornography and intoxication incidents about which Gillespie was dishonest. The Board ruled that Gillespie was dishonest and evasive in answering questions about both of the incidents, specifically holding that he had "violated [s]ection 2-5-2.08(1) and [s]ection 2-2-04.05 of the Department [p]olicies." However, the Board concluded that termination was unwarranted because Gillespie did not violate any City policy by showing the pornographic image to other officers. Although the Board's determination that an officer cannot violate section 2-2.05.05(7) unless the officer is specifically interacting with a member of the public is dubious, we need not reach this issue because the Police Chief concluded that dishonesty was an independent basis for terminating Gillespie. Therefore, the Board's focus on whether Gillespie's behavior during the intoxication incident could be the subject of disciplinary action because he was off duty is also misplaced. The Police Chief fired Gillespie because he lied about the intoxication incident and the pornography incident, not because he participated in them. Thus, the issue before the Board should have been whether the sanction of termination was appropriate for Gillespie's violation of Department policy regarding honesty and candor—an issue independent of the merits of the separate sanctions recommended for Gillespie's conduct during the intoxication and pornography incidents.

¶45    Accordingly, the Board exceeded its discretion when it ignored the Police Chief's assessment of the impact of Gillespie's dishonesty on his ability to perform the duties expected of a police officer. It also exceeded its discretion by failing to defer to the Police Chief's advantaged position to evaluate the discipline appropriate under the circumstances. As a result, we set aside the Board's decision on this issue and remand for further proceedings applying this standard of review and focusing on the relevant issue—whether the sanction of termination is proportional to the violation of Department policy requiring police officers to be honest and candid.

B. Consistency of the Discipline with Similar Incidents

¶46    Even if a sanction is appropriate, the Board must determine whether it is proportional. Here, the Board never reached this issue because it concluded that termination was not an appropriate sanction. Because this issue may be relevant on remand, we address it for the convenience of the Board and the parties. *See generally State v. Verde*, 2012 UT 60, ¶ 46 (providing guidance to the trial court on remand).

¶47    The City argues that the level of discipline imposed on Gillespie was consistent with the discipline imposed on other officers guilty of dishonesty. In particular, the City highlights the Police Chief's testimony that although Gillespie was the first officer to be terminated for dishonesty during an IA interview, two other officers facing similar allegations chose to resign rather than face termination.[7] The Police Chief also indicated that Gillespie's dishonesty was more egregious than the behavior in the prior cases, explaining that "it was not as clear cut" that the other officers had lied "in an official investigation."

---

7. The assistant police chief did not recall if Gillespie had been given the opportunity to resign.

¶48    In response, Gillespie argued that the City hampered his attempts to prove disproportionality by refusing his requests for personnel files, thereby preventing him from independently evaluating whether other officers who had been dishonest during IA investigations had been terminated. The City disputed Gillespie's position on the ground that his request was too broad because he sought the production of all IA files irrespective of whether dishonesty was an issue. The Board never resolved this dispute or considered the substantive issue of whether Gillespie's termination was consistent with other disciplinary actions. On remand, the Board may make appropriate findings of fact regarding the consistency of the sanction imposed on Gillespie for his dishonesty.

CONCLUSION

¶49    The Board exceeded its discretion when it adopted its own standard of review under which it concluded that Gillespie was not afforded sufficient notice. The Board also exceeded its discretion by failing to give deference to the Police Chief and not considering the proper factors in assessing the appropriateness of the sanction. We therefore set aside the Board's decision and remand for proceedings consistent with this decision.

————