2014 UT App 74

Tyler James LARSEN, Petitioner and Appellee,

v.

DAVIS COUNTY and Davis County Career Service Council, Respondents and Appellants.

No. 20110875–CA.

Court of Appeals of Utah.

April 3, 2014.

Rehearing Denied May 7, 2014.

Jesse C. Trentadue, Carl F. Huefner, and Britton R. Butterfield, for Appellant Davis County.

Kristin A. Van Orman and Jeremy G. Knight, for Appellant Davis County Career Service Council.

Tyler James Larsen, Appellee Pro Se.

Judge J. FREDERIC VOROS JR. authored this Opinion, in which Judge GREGORY K. ORME concurred. Judge JAMES Z. DAVIS concurred in the result.

VOROS, Judge:

¶ 1 Davis County terminated the employment of Tyler James Larsen, an assistant county attorney, for misconduct in connection with a 2010 aggravated-robbery trial. Larsen appealed to the Davis County Career Service Council, which upheld his termination. Larsen then appealed to the district court, which set aside his termination on the ground that the County failed to provide Larsen with adequate notice of all of the grounds for his termination. The County appeals, and we reverse.

## BACKGROUND[1]

### The Apadaca Trial

¶ 2 The Davis County Attorney's Office assigned Tyler Larsen to an aggravated-robbery trial set for August 2010. The defendant in that case, Joseph Apadaca, was already serving a prison term in Idaho for an earlier conviction. While preparing for trial, Larsen visited the site of the robbery, a Clearfield clothing store, to meet with two eyewitnesses. Larsen later acknowledged that after "having a hard time communicating" with one eyewitness, he showed her a black-and-white photo of Apadaca. Larsen did not remember showing a photo to the other eyewitness. But a Clearfield police officer who accompanied Larsen to the clothing store stated that Larsen showed a color photo to both eyewitnesses:

> [The officer] said Mr. Larsen told him to show the witnesses a larger, more recent color photograph of Joseph Apadaca after one witness had difficulty identifying Joseph Apadaca from the photo Mr. Larsen showed him. [The officer] said that he asked Mr. Larsen if he was sure he wanted to show the photograph and that Mr. Larsen told him to go ahead and show the photo.

¶ 3 At the Apadaca trial, Larsen called one of the clothing-store eyewitnesses as his first witness. On cross-examination, defense counsel asked the eyewitness if he had "been

1. The Davis County Career Service Council acted as the fact-finder below. We therefore recite the facts in a light favorable to the Council's decision. *See In re J.F.S.*, 803 P.2d 1254, 1254 (Utah Ct.App.1990); *State v. One 1982 Silver Honda Motorcycle*, 735 P.2d 392, 393 (Utah Ct.App. 1987). "We present conflicting evidence only when necessary to understand issues raised on appeal." *State v. Kruger*, 2000 UT 60, ¶ 2, 6 P.3d 1116.

shown a photo or seen ... a photo ID" of the suspect. The eyewitness said no. Larsen made no attempt to correct the record. When cross-examining the second eyewitness, defense counsel asked her whether "she had ever been shown a lineup or photo array," and she answered yes. As a result, Apadaca moved for a mistrial, and the district court granted Apadaca's motion.[2]

### Larsen's Termination and Appeals

■ ¶ 4 After learning of Larsen's conduct during the Apadaca trial, the County Attorney signed a pretermination letter placing Larsen on administrative leave. The letter described in detail Larsen's alleged misconduct. In effect, the letter accused Larsen of attempting to obtain a criminal conviction by knowingly using tainted eyewitness testimony and not correcting the record when he had an opportunity to do so.[3] Five days later, a second letter, titled "Notice of Pre–Disciplinary Hearing," restated those allega-

tions and invited Larsen to a meeting the following day in the County Attorney's office. The letter informed Larsen, "You will be afforded an opportunity at this meeting to present a defense to the above noted allegations" and "tell your side of the story." The letter also warned Larsen that termination was a possible outcome.

¶ 5 The meeting was recorded and transcribed. Larsen, the County Attorney, and three other members of the Davis County Attorney's Office were present. The first twenty pages of the transcript contain Larsen's virtually uninterrupted explanation of his handling of the case. The County Attorney then confronted Larsen with the inconsistency between his earlier claims of experience with his current claim that he was "in over his head"

> [County Attorney]: Tyler, one of the things you talked about and were trying to sell me at that time is that you had more

---

**2.** As the United States Supreme Court explained in *Simmons v. United States,* the "improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals." 390 U.S. 377, 383, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). The danger of misidentification increases "if the police display to the witness only the picture of a single individual" or "if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime." *Id.* If an improperly administered photo lineup results in a misidentification, "the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification." *Id.* at 383–84, 88 S.Ct. 967.

Recognizing those dangers, the Utah Supreme Court has "strongly discourage[d]" the practice of using "photo arrays as a substitute for lineups" and has "encourage[d] law enforcement officials ... to curb the use of photo arrays as much as possible." *State v. Lopez,* 886 P.2d 1105, 1111 (Utah 1994). When used, photo arrays "should not emphasize one photo more than another." *State v. Thamer,* 777 P.2d 432, 435 (Utah 1989). "Any manipulation indicating that the police believe one of the photographs portrays the accused could lead to a finding of suggestiveness." *Id.* Single-photo identifications, in particular, present a "serious danger of suggestiveness." *Nassar v. Vinzant,* 519 F.2d 798, 801 (1st Cir.1975); *see also United States v. Montgomery,* 150 F.3d 983, 992–93 (9th Cir. 1998) (holding that absent any indication that the government's "suggestive identification proce-

dures [were] imperative," a single-photo lineup used to refresh an eyewitness's memory was "unnecessarily suggestive").

A single-photo lineup is more dangerous than a "showup," which "typically take[s] place soon after the crime is committed, usually at the scene of the crime or where the suspect is apprehended," in order to allow "the victim or witness [to] immediately identify whether the person the police has in custody is actually the one who committed the crime." *See State v. Mincy,* 838 P.2d 648, 655 (Utah Ct.App.1992). In showups, the "elapsed time" between the crime and the identification is typically minimal, reducing the likelihood of a misidentification. *State v. Ramirez,* 817 P.2d 774, 783 (Utah 1991). Here, more than three years passed between the Clearfield robbery and the eyewitness identification Larsen prompted with a single-photo lineup.

**3.** "[W]hen a prosecutor is aware that testimony is false, he or she has a duty to correct the false impression." *State v. Gordon,* 886 P.2d 112, 116 (Utah Ct.App.1994). A prosecutor's failure to immediately correct testimony he knows to be false constitutes misconduct. *State v. Doyle,* 2010 UT App 351, ¶ 3, 245 P.3d 206. Utah's Rules of Professional Conduct address this issue specifically: if "a witness called by a lawyer has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal." Utah R. Prof. Conduct 3.3(a)(3). Larsen denies that he knowingly failed to correct the record after the first witness's false testimony, but his factual challenge is not an issue on appeal.

experience than [another lawyer in the office], [that] you were one of the senior attorneys in the office, that you were a go-to guy, that you were one of the best attorneys that we had. Now you're in here saying today just the opposite, "I don't know a damn thing."

Mr. Larsen: Uh-huh.

[County Attorney]: That's what I'm hearing from you today. You know, I'm sorry this—I don't know anything. I don't even [know] what freaking Rule 16 of the Utah Rules of Criminal Procedure is. I'm having a tough time buying that, man.

Mr. Larsen: I'm trying to think what it is. I don't know it [inaudible] I mean, I can't quote it.

¶ 6 The incongruity between Larsen's claimed experience level and his pure-heart/empty-head defense put his credibility at issue, and one deputy county attorney explored the incongruity. He explained to Larsen that he was having a hard time "giving [Larsen] the benefit of the doubt" in light of "something similar happening in the past," in particular an instance where Larsen misled a judge and the County Attorney. Larsen replied, "I think we're here today to talk about the Apadaca trial and what was in the past I thought was put in the past and that was part of our agreement—." The Deputy County Attorney agreed but stressed that he was "struggling with believing" Larsen's explanations of what happened: "I've given you sort of the benefit in the past and we really worked through it and we really wanted to see you do well. That's why I'm struggling. So help me understand why this would be different than the other time." The County Attorney added that Larsen's history came up only because it shed light on the mistakes he made prosecuting Apadaca:

> [E]chos from the past ring louder and louder and louder the longer we sit in here in this meeting today.... [T]he answers and the explanations today are similar to what we were given in the past, you know, "I didn't know," "I didn't remember." ... You know, it's here we go again. This is what we heard last time, too.

The County Attorney emphasized that the office's termination decision would not be "because of" or "driven by" Larsen's prior errors but that the Attorney's Office may consider those errors when determining whether Larsen's most recent violations were "intentional or not."

¶ 7 The informal hearing resulted in Larsen's termination. The County Attorney sent Larsen a four-and-a-half-page termination letter. The letter devotes well over three pages to describing in detail the misconduct for which Larsen was being terminated. The letter also asserts that Larsen's explanation that he had acted in ignorance lacked credibility in light of his history of misrepresentations to a judge and to the County Attorney himself. In the course of this explanation, the letter refers to and then discounts Larsen's prior missteps:

> I have put accounts from the relevant parties involved in the Joseph Apadaca case specifically in context with ... my observations of your patterns of behavior while employed here.... We tried, but we cannot ignore the past in assessing the current Apadaca situation (even though your misconduct during this trial and preparation are self-evident and alone require this termination action).

¶ 8 Larsen filed a grievance with the County, arguing that the County Attorney's pre-termination letter had not given Larsen notice of all the allegations discussed at the pretermination hearing and cited in the termination letter. The County denied Larsen's grievance, and Larsen appealed to the Davis County Career Service Council. The Council affirmed the County's termination and grievance decisions. Larsen next appealed to the district court, which set aside the Council's decision to deny Larsen's grievance, ruling that there was "no question that the County took ... additional allegations into account in determining to terminate Larsen's employment." The County and the Council (collectively, the County) now appeal the district court's decision.

## ISSUE AND STANDARD OF REVIEW

¶ 9 The County contends that the district court erred by ruling that the Attorney's Office failed to give Larsen adequate

predisciplinary notice of the allegations against him. When reviewing the Council's decision, the district court relied on the same record we rely on here. *See* Utah Code Ann. § 17–33–4(d)(iii) (LexisNexis 2009). We therefore "do not accord any particular deference to the district court's decision." *Patterson v. Utah County Bd. of Adjustment*, 893 P.2d 602, 603 (Utah Ct.App.1995); *Kline v. Utah Dep't of Health*, 776 P.2d 57, 60 (Utah Ct.App.1989) ("We accord no presumption of correctness to the [district court's judgment] since its review of the administrative record is not more advantaged than our own."). Rather, we presume the validity of the Council's decision and review that decision only to determine "whether the decision is arbitrary or capricious." Utah Code Ann. § 17–33–4(d)(iv). "However, to the extent that the [Council's] decision implicates due process, we review it for correctness." *Taylorsville City v. Taylorsville City Emp. Appeal Bd.*, 2013 UT App 69, ¶ 16, 298 P.3d 1270.

## ANALYSIS

¶ 10 The County contends that Larsen received adequate notice of the allegations that led to his termination and thus received due process. The County argues that rather than asking whether the County Attorney's Office considered violations not included in Larsen's pretermination notice, this court should ask whether the allegations stated in Larsen's pretermination notice were sufficient to support his termination. Larsen responds that the County terminated him based on "allegations that it had never put in any notice" prior to the pretermination hearing. The County's failure to inform him of those allegations in advance, Larsen argues, denied him "notice and an opportunity to respond"—the "essential requirements of due process." *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).

■■■ ¶ 11 We conclude that the County accorded Larsen all the process he was due in view of the circumstances of this case. "Due process is not a technical conception with a fixed content unrelated to time, place, and circumstances; it is flexible and requires such procedural protections as the particular situation demands." *Worrall v. Ogden City Fire Dep't*, 616 P.2d 598, 602 (Utah 1980) (citing *Mathews v. Eldridge*, 424 U.S. 319, 334–35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)). "[T]he root requirement" of the Due Process Clause is "that an individual be given an opportunity for a hearing before he is deprived of any significant property interest." *Loudermill*, 470 U.S. at 542, 105 S.Ct. 1487 (citation and internal quotation marks omitted). For a career employee like Larsen, who enjoys a constitutionally protected property interest in his employment, this principle requires "some form of pretermination hearing," that is, "some opportunity for the employee to present his side of the case." *Id.* at 542–43, 105 S.Ct. 1487.

■■■ ¶ 12 This "pretermination 'hearing,' though necessary, need not be elaborate." *Id.* at 545, 105 S.Ct. 1487. Indeed, "the pretermination hearing need not definitively resolve the propriety of the discharge"; rather, it serves as "an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Id.* at 545–46, 105 S.Ct. 1487. Thus, the "essential requirements" are "notice and an opportunity to respond"—"[t]he opportunity to present reasons, either in person or in writing, why proposed action should not be taken." *Id.* at 546, 105 S.Ct. 1487. To secure this right, "[t]he tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id.* "To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." *Id.*

¶ 13 To successfully challenge a termination, an employee must identify procedural errors and "establish how these procedural errors were harmful"—that is, how compliance with these procedures "would have resulted in a different outcome absent such errors." *Lucas v. Murray City Civil Serv. Comm'n*, 949 P.2d 746, 755 (Utah Ct.App.

1997) (citing *Loudermill*, 470 U.S. at 547, 105 S.Ct. 1487).

¶ 14 In *Hugoe v. Woods Cross City*, we addressed the level of specificity *Loudermill* requires in the "notice of the charges" and "explanation of the employer's evidence." 2013 UT App 278, ¶ 9, 316 P.3d 979. Woods Cross City provided its employee Hugoe with notice that it was considering discipline "as a result of incidents which, if substantiated, [were] in violation of City policy, including threatening, intimidating or interfering with fellow employees on the job, insubordination, misusing City property, and using vulgar language." *Id.* ¶ 8 (internal quotation marks omitted). Hugoe claimed that this notice was too vague to inform him of the fact that the City based its discipline on a particular incident that occurred on July 17, 2012. *Id.* He also argued that, in reviewing his termination, the Board improperly considered a prior act of misconduct that the City had not cited in its termination letter. *Id.* ¶ 10.

¶ 15 We rejected Hugoe's challenges. We acknowledged that "the notice [did] not specifically reference the July 17 incident or identify the specific evidence that would be used against him." *Id.* ¶ 9. Nevertheless, we observed that Hugoe had "failed to adequately explain how the deficiencies in the notice inhibited his ability to respond to the allegations against him." *Id.* And we rejected Hugoe's challenge to the board's consideration of prior evidence in light of the board's statement that "[n]otwithstanding the evidence of prior discipline," Hugoe's actions on July 17, 2012, "standing alone, were so grievous as to justify termination of employment." *Id.* ¶ 10 (alteration in original) (internal quotation marks omitted).

¶ 16 As in *Hugoe*, Larsen's pretermination hearing served as "an initial check against mistaken decisions—essentially, a determination of whether there [were] reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545–46, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). And like Hugoe, Larsen received notice and an opportunity "to present reasons, either in person or in writing, why proposed action should not be taken." *Id.* at 546, 105 S.Ct. 1487.

¶ 17 Accordingly, as in *Hugoe*, we must ask whether Larsen's misconduct before and during the Apadaca trial, "standing alone," was "so grievous as to justify" his termination. 2013 UT App 278, ¶ 10, 316 P.3d 979. The County's appeal thus ultimately turns on a single sentence in Larsen's termination letter:

> We tried, but we cannot ignore the past in assessing the current Apadaca situation (*even though your misconduct during this trial and preparation are self-evident and alone require this termination action* ).

(Emphasis added.) In affirming Larsen's termination, the Council impliedly accepted the County Attorney's assertion that Larsen's conduct during the Apadaca trial "alone requires this termination action." The central issue before us is whether this finding "exceeds the bounds of reasonableness and rationality." *See Harmon v. Ogden City Civil Serv. Comm'n*, 2007 UT App 336, ¶ 6, 171 P.3d 474 (citation and internal quotation marks omitted).

¶ 18 We see no principled basis to distinguish the present case from *Hugoe*. There we stated, "[E]ven accepting Hugoe's assertion that the Board's reliance on the November 2011 incident would have violated his due process rights, such a violation did not occur because the Board did not rely on the previous discipline in reaching its decision." *Hugoe*, 2013 UT App 278, ¶ 10, 316 P.3d 979. We based our conclusion on the fact that the city employment appeal board "explicitly stated that '[n]otwithstanding the evidence of prior discipline, ... the July 17, 2012 statements and actions of Mr. Hugoe, standing alone, were so grievous as to justify termination of employment.'" *See id.* (alteration in original). Likewise here, even accepting Larsen's assertion that the County Attorney's reliance on his prior job history would have violated his due process rights, the County Attorney asserted, and the Council accepted, that Larsen's acts of misconduct in connection with the Apadaca trial, "standing alone, were so grievous as to justify termination of employment." *Id.* (internal quotation marks omitted).

¶ 19 And what actions of Hugoe did we conclude, "standing alone, were so grievous as to justify termination" of his city employment? "[U]sing 'vulgar and profane language in a threatening and insubordinate manner towards' the operations manager." *Hugoe v. Woods Cross City,* 2013 UT App 278, ¶ 3, 316 P.3d 979. Hugoe's insubordinate language doubtless justified his termination. But cursing out your boss pales in comparison to knowingly using tainted eyewitness testimony in an attempt to convict someone of a crime likely to result in a sentence of five years to life. *See* Utah Code Ann. § 76–6–302(2) (LexisNexis Supp.2003) (making aggravated robbery a first degree felony); *id.* § 76–3–203 (setting sentences for first degree felonies at five years to life).

¶ 20 We thus conclude that the Council did not exceed the bounds of reasonableness and rationality in determining that Larsen's misconduct in the Apadaca trial alone required his termination. Indeed, we agree that Larsen's Apadaca trial misconduct as described in the pretermination and termination letters, without more, supports termination.

¶ 21 In addition, like Hugoe, Larsen has "failed to adequately explain how the deficiencies in the notice inhibited his ability to respond to the allegations against him." *Hugoe,* 2013 UT App 278, ¶ 9, 316 P.3d 979. And where, as here, the noticed conduct alone warrants termination, how Larsen could have been harmed by a few references to unrelated misconduct would require considerable explanation, which Larsen has not offered.

¶ 22 Moreover, unlike in *Hugoe,* Larsen opened the door to the County Attorney's consideration of his prior misconduct. That misconduct became relevant only when Larsen, in the pretermination hearing itself, claimed, in the County Attorney's phrase, that he didn't "know a damn thing." Had Larsen's explanation been credible in context—if, say, he had been a rookie prosecutor—it might have altered the hearing's outcome. Instead, it backfired, for two reasons: first, Larsen had previously sold himself as an experienced "go-to guy," and second, Larsen apparently had a history of dishonesty. The County officials could have said nothing to Larsen about these concerns, given him no opportunity to address them, and saved themselves a lawsuit. Instead, they took what we believe was the better course—they candidly disclosed their reasons for skepticism and afforded Larsen an opportunity to rebut them.

¶ 23 The district court expressed concern with the Council's findings, and we agree that those findings are, as the County Attorney acknowledged, "a little scant." But they are sufficient. Agency findings must be " 'adequately detailed so as to permit meaningful appellate review.' " *Id.* ¶ 12 (quoting *Adams v. Board of Review of the Indus. Comm'n,* 821 P.2d 1, 4 (Utah Ct.App.1991)). "In order for us to meaningfully review the findings [an administrative board], the findings must be 'sufficiently detailed and include enough subsidiary facts to disclose the steps by which the ultimate conclusion on each factual issue was reached.' " *Nyrehn v. Industrial Comm'n,* 800 P.2d 330, 335 (Utah Ct.App.1990) (quoting *Acton v. Deliran,* 737 P.2d 996, 999 (Utah 1987)). Finally, "the failure of an agency to make adequate findings of fact on material issues renders its findings 'arbitrary and capricious' unless the evidence is 'clear, uncontroverted and capable of only one conclusion.' " *Id.* (quoting *Kinkella v. Baugh,* 660 P.2d 233, 236 (Utah 1983)).

¶ 24 Here, in two sets of findings, the Council found that Larsen conceded showing witnesses photographs of Apadaca before trial but that he "could not recall" showing them a recent color photo; that a police officer confirmed that he was with Larsen during the conversations with some of the witnesses and that Larsen told him to show one witness the recent color photo notwithstanding the officer's expressed trepidation; that Larsen did not deny that he failed to disclose to the court and defense counsel the fact that he had shown the photos to the witnesses; that public defenders involved with the trial testified without contradiction that well-established rules of criminal procedure prohibit what Larsen did; that the trial defense attorney was "stunned" when he learned that the witness had seen the photos; and that Larsen's conduct resulted in a mis-

trial and a loss of trust between him and the County Attorney. The Council concluded that this "indisputable evidence" demonstrated that Larsen's conduct violated both the law and rules of professional conduct governing attorneys and that Larsen had received proper notice and an opportunity to be heard on the issues that led to his termination.

¶ 25 The Council made no reference to unrelated misconduct by Larsen except to refer to the County Attorney's statement that Larsen's conduct relative to the Apadaca trial "alone requires this termination action." This reference, together with the absence of any mention of unrelated misconduct and the conclusion that Larsen received proper notice, clearly signals that the Council accepted the County Attorney's assessment of the seriousness of Larsen's core misconduct. These findings leave no doubt about "the steps by which the ultimate conclusion on each factual issue was reached." *Adams*, 821 P.2d at 4 (citation and internal quotation marks omitted).

¶ 26 As stated above, "[d]ue process is not a technical conception with a fixed content unrelated to time, place, and circumstances; it is flexible and requires such procedural protections as the particular situation demands." *Worrall v. Ogden City Fire Dep't*, 616 P.2d 598, 602 (Utah 1980) (citing *Mathews v. Eldridge*, 424 U.S. 319, 334–35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)). Here, Larsen was terminated for knowingly using tainted testimony in an attempt to obtain a robbery conviction and then not fully disclosing the facts once his gambit came to light. This misconduct warrants termination of a prosecutor.

¶ 27 True enough, Larsen's explanations in the pretermination hearing prompted County officials to briefly explore unrelated (and unnoticed) misconduct, and the County Attorney even referenced that misconduct in the termination letter. But Larsen's misconduct relative to the Apadaca trial was the clear focus of Larsen's pretermination hearing, his termination letter, and his hearing before the Davis County Career Service Council. The Council held an appropriate hearing and concluded, in brief but unmistakable findings, that the charged misconduct alone warranted

termination. In light of the foregoing, Larsen received all the process he was due.

## CONCLUSION

¶ 28 We reverse the judgment of the district court and reinstate the orders of the Council.