2024 UT App 36

# THE UTAH COURT OF APPEALS

CHARLES CIEPLY,
Appellant,
*v.*
WEBER COUNTY CAREER SERVICE COUNCIL AND WEBER COUNTY,
Appellees.

Opinion
No. 20220449-CA
Filed March 21, 2024

Second District Court, Ogden Department
The Honorable Noel S. Hyde
No. 200905611

Jeremy G. Jones and Richard R. Willie,
Attorneys for Appellant

Christopher F. Allred and Courtlan P. Erickson,
Attorneys for Appellees

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN D. TENNEY
concurred.

ORME, Judge:

¶1     Charles Cieply appeals his demotion from the rank of corporal to the rank of deputy and a temporary reduction in pay. This disciplinary action was imposed for Cieply's multiple violations of a Weber County policy prohibiting the supervision of relatives. Because the discipline was neither proportional nor consistent, we reverse the district court and vacate the order of the administrative law judge (the ALJ) imposing these sanctions.

BACKGROUND[1]

¶2    In 2015, Cieply began working as a deputy at the Weber County Sheriff's Office (the Sheriff's Office), which oversees two jail facilities in Ogden, Utah. In 2018, Cieply was promoted to the rank of corporal. This promotion came with additional responsibilities, including "command of a post" that consisted of four housing pods. Cieply's wife is employed as a corrections assistant at the same jail where he primarily works.

¶3    At all relevant times, the Weber County Human Resources Nepotism Policy (the nepotism policy) was in effect. Under the nepotism policy, "No county officer or employee shall directly or indirectly supervise a relative in any county position or employment paid out of county funds." The list of relatives that a county officer was prohibited from supervising included, as relevant here, an officer's wife and uncle. The Sheriff's Office also had a policy in place that, for purposes of this appeal, was similar to the nepotism policy.[2]

---

1. Because Cieply does not challenge the ALJ's findings of fact, which the district court affirmed, "we state the facts and all legitimate inferences to be drawn from them in the light most favorable to the [ALJ's] findings." *WWC Holding Co. v. Public Service Comm'n*, 2002 UT 23, ¶ 2, 44 P.3d 714.

2. Below, Cieply argued that the Sheriff's Office policy conflicted with the nepotism policy because the former was less stringent than the latter, thus causing confusion. But both the ALJ and the district court rejected this argument. The ALJ held "that although there is conflicting language between the Sheriff's Office written policy and Weber County's written policy, that conflict is not relevant here" because it was confined to an exception that did not apply to this case. Similarly, the district court held that "no

(continued…)

¶4     Cieply's first violation of the nepotism policy occurred in June 2019, when he was assigned to work at the same housing pod that his wife was assigned to. Subsequently, in an "informal discussion," Cieply's supervising sergeant at the time informed him that the supervision of his wife violated the nepotism policy. Following the discussion, Cieply "understood that his supervisors' interpretation of [the nepotism policy] prohibited [him] from supervising—in this case working in the same post—as his wife." Cieply received "[n]o formal discipline of any kind" for this first violation. In a subsequent email to a supervising lieutenant (Lieutenant), the sergeant stated that following the informal conversation, "Cieply understood the policy and that in the future [he] would make all efforts to remedy the situation if it happened again." The sergeant also told Lieutenant that he would email the other housing sergeants to advise them not to assign Cieply to the same post as his wife. The sergeant later testified before the ALJ that he did send such an email, although it was not submitted into evidence. Toward the end of that year, that sergeant was reassigned, and Cieply began reporting to a different sergeant (Sergeant).

¶5     In January 2020, Cieply was assigned to supervise his wife six times, but Cieply was directly responsible for making only one of those assignments. These violations came to the attention of Lieutenant during his regular review of post logs. Lieutenant subsequently informed Sergeant that such assignments "must cease immediately." He also initiated disciplinary proceedings against Cieply, which included issuing a Notice of Potential Discipline.

---

material conflict in the two policies has been demonstrated, and the legal determination of which policy controls is not in substantial question." Cieply does not challenge these rulings on appeal.

¶6    In addition to the nepotism policy violations, the notice also charged Cieply with "disregarding safety protocols and practices that are in place to keep staff and inmates safe" (the safety policy).[3] Specifically, in November 2019, Cieply had failed to properly restrain two maximum-security inmates before opening cell doors to respond to an exigent circumstance.

¶7    Cieply responded to the charges at a pre-determination hearing.[4] Subsequently, the Weber County Sheriff (the Sheriff) issued a Notice of Discipline finding that Cieply had violated the nepotism policy and the safety policy. The Sheriff disciplined Cieply for those violations by imposing a permanent $1.30 hourly pay reduction and demoting him back to the rank of deputy. Cieply appealed the Sheriff's decision to the Weber County Career Service Council, which referred the matter to the ALJ. *See* Utah Code Ann. § 17-33-4.5(3) (LexisNexis 2017).

¶8    Before the ALJ, evidence was presented that Lieutenant and another corporal had also violated the nepotism policy. Namely, Lieutenant, during a temporary placement as chief deputy over corrections, had indirectly once supervised his uncle in late 2019 and possibly "for a longer period of time in 2018." Lieutenant testified that in 2018, the nepotism policy "was not closely followed," but that changed when a new human resources director was hired. The new director in question, however, testified at the hearing—and the ALJ later found—that the nepotism policy, which prohibited both direct and indirect

---

3. The notice additionally listed several other violations that the Sheriff ultimately did not cite in the subsequent Notice of Discipline as bases for the discipline he eventually imposed on Cieply. *See infra* ¶ 7.

4. Per Weber County's policy, the purpose of a pre-determination hearing is to give an employee facing discipline "an opportunity to be heard and provide new or additional information that might be cause to prevent disciplinary action."

supervision of relatives, went into effect in mid-2017 and that there had been much pushback at the time. The director opined that Lieutenant's indirect supervision of his uncle violated the nepotism policy.

¶9 The corporal, like Cieply, had been assigned to the same shift as his wife, who also worked as a corrections assistant at the jail.[5] Lieutenant testified that he had not initiated an investigation into the corporal for violating the nepotism policy because he had not gotten a personnel complaint. But Lieutenant had earlier testified that *he* was the one who initiated the personnel complaint against Cieply. There was no evidence presented that either Lieutenant or the corporal had received warnings or otherwise been disciplined for their violations.

¶10 Sergeant testified that at the time he made the January assignments, he was aware of the nepotism policy and that Cieply and his wife were married, but he did not recall receiving an email from Cieply's prior sergeant advising that Cieply and his wife were not to be assigned to work together. He also stated that shortly after the violations, around February 2020, Lieutenant called to inform him that Cieply and his wife were not to work

---

5. The ALJ's order did not specify how many times the other corporal violated the nepotism policy, but it likely occurred multiple times. Notably, the ALJ's order did not list the number of violations as a distinguishing factor between Cieply's violations and that of the other corporal. Additionally, a deputy testified that he saw the corporal working as the officer in charge where his wife would have been under his supervision. Cieply also testified regarding an instance in which the corporal was the officer in charge and would have had a supervisory role over his wife. And in his brief, Cieply asserts that shift schedules in the record "clearly show [the corporal] and his wife . . . on the same squad and schedule from December [2019] though April 2020," which assertion Weber County has not contradicted.

together. Sergeant also testified that during the call, Lieutenant verbally reprimanded him for making the assignments, although there was no evidence presented that the reprimand was ever documented or otherwise formalized. Sergeant could not recall whether Cieply had approached him at the time to advise him that he should not be working with his wife, although "[h]e may have."

¶11 Cieply testified that he told Sergeant that he and his wife were not supposed to work together and that Sergeant responded, "[W]ell, if anything comes up, let me know and we'll handle it then, we'll cross that bridge or we'll find someone who can." Cieply stated that he considered Sergeant's staffing assignments to be an order and that when he had previously questioned orders, he "was told that policy's not a by the letter thing, it's a guideline." This testimony is supported by a Coaching Note issued to Cieply in August 2019—some two months after the first nepotism policy violation—for not following the chain of command when recommending several changes to policy and procedure and sometimes resubmitting suggestions after being given an answer. The note stated that he "was reminded that policy is a guideline and not a follow per the letter type thing." The Sheriff similarly testified, "Policies . . . are something that's not . . . an absolute mandate. It's guidance."

¶12 The chief over corrections testified that Cieply's supervisors, although also culpable for the nepotism policy violations, had not been formally counseled or coached for their roles in the violations. He could not answer why they had not been. Cieply's prior sergeant similarly testified that Sergeant— and to a lesser extent, Lieutenant—were responsible for ensuring that the nepotism policy was not violated. He also stated that Cieply, upon discovering that he was assigned to work with his wife, had a "responsibility to immediately notify the supervisor to remedy the situation."

¶13 Also of note, Weber County Human Resources Policy 3-6000 (the discipline policy) detailed the procedures for employee discipline. The discipline policy states,

> The usual sequence of progressive discipline shall be oral warning, written warning, suspension and termination. Demotion may also be used in the progressive discipline process. Deviations from procedure may be justified depending on the severity and circumstances of the action(s) to be disciplined. If, in the judgment of the supervisor, the facts show aggravated misconduct, disciplinary action may proceed directly to suspension or termination after the procedures in [a required pre-determination hearing] are followed.

In discussing the discipline policy, the ALJ stated that "[b]ecause of its nature with associated economic harm and the requisite [pre-determination hearing], it appears that demotion also is, or should be, included in the categories of discipline which require a finding of aggravated misconduct in order to skip steps in the progressive discipline process." The discipline policy does not define "aggravated misconduct" but appears to leave the issue to "the judgment of the supervisor."

¶14 Following the hearing, the ALJ issued his Findings of Fact and Final Decision (the ALJ's order).[6] The ALJ first found that Cieply had violated both the nepotism policy and the safety policy. The ALJ then considered "whether the level of discipline imposed by the Sheriff is proportionate and not inconsistent with previous sanctions imposed." He determined that the safety policy violation did not justify demotion because "demotion

---

6. At the hearing, much attention was also given to the safety policy violation. Because those details are not relevant to this appeal, we do not recount them here. *See infra* note 11.

would be highly inappropriate and inconsistent with other sanctions imposed by [the Sheriff's Office] for this offense" and because Cieply's "conduct is precisely the type of conduct which does *not* rise to the level of gross misconduct sufficient to skip steps in the disciplinary process."

¶15   But the ALJ held that it was not an abuse of discretion for the Sheriff to demote Cieply for violating the nepotism policy. In so holding, the ALJ considered the following factors:

- Cieply "had been previously advised (even if no formal warning was issued) that his working with his wife was a violation of policy and that if it happened inadvertently he should notify a supervisor";

- six different violations of the nepotism policy occurred, including one that Cieply himself assigned;

- Cieply's conduct was a poor example of leadership to subordinate deputies; and

- although Cieply "shared a substantial portion of blame over these incidents, others that also shared in the blame received no formal discipline."

The ALJ also acknowledged "that enforcement of the nepotism policy—at least within the Sheriff's Office—has been at best, inconsistent" as "there appears to be no evidence that the Sheriff's Office has issued discipline with respect to any other violations of the nepotism policy, despite the fact that there have been other violations." But the ALJ stated that the other violations were "apparently not as serious as those here" because Cieply, unlike Lieutenant or the other corporal, had previously been advised regarding the policy. The ALJ concluded that "[a]ffording the Sheriff discretion, particularly with respect to the issue of

leadership, the Sheriff was acting within his discretion when he demoted [Cieply] from Corporal to Deputy."[7]

¶16 The ALJ next determined that the permanent pay reduction for violation of both policies was "excessive and disproportionate." In so holding, the ALJ stated that there had been no prior formal progressive discipline; that the nepotism policy violations, in particular, "demonstrate failures of leadership" and not "a failure to perform the core competencies of a Sheriff's deputy"; that Cieply's non-reduced pay rate was consistent with that of a deputy of his tenure; and that such a permanent reduction "would be inconsistent with other discipline imposed by the Sheriff." The ALJ thus modified the Sheriff's decision and directed that Cieply's pay be restored to its prior rate. *See* Utah Code Ann. § 17-33-4(1)(c)(iv) (LexisNexis 2017). But because a temporary pay reduction would not have constituted an abuse of discretion, the ALJ declined to award back pay.

¶17 Cieply filed a petition for review of the ALJ's order in the district court, *see id.* § 17-33-4(1)(d), asking the court to reinstate him to the rank of corporal and to award back-pay. In conducting its review, the court presumed that that the ALJ's order was valid and limited its determination to whether the decision was arbitrary and capricious. *See id.* § 17-33-4(1)(d)(iv) ("In reviewing a decision of the career service council, the district court shall

---

7. Confusingly, immediately prior to stating that the Sheriff acted within his discretion in demoting Cieply, the ALJ stated, "Considering all of these factors, the discipline imposed, as a whole, was not proportionate to the offense committed and the decision was inconsistent with discipline imposed in similar circumstances." As discussed in greater detail in the Analysis section below, discipline that is not proportionate or that is inconsistent constitutes an abuse of discretion. But, in light of the ALJ's ultimate conclusion and discussion of the factors, this contradiction is likely the result of a misstatement.

presume that the decision is valid and may determine only whether the decision is arbitrary or capricious."). *See also id.* § 17-33-4(1)(d)(iii) ("If there is a record of the career service council proceedings, the district court review shall be limited to the record provided by the career service council."); *id.* § 17-33-4.5(2)–(3) (providing when the career service council either may or must refer the matter to an administrative law judge). The court ultimately affirmed the ALJ's order.

¶18 After affirming the ALJ's finding that Cieply violated the nepotism policy, the court next turned to the issue of whether the discipline imposed for the violation was arbitrary or capricious. The court first acknowledged that the discipline policy was ambiguous because the phrasing of the initial sentence that the "usual sequence . . . shall be" was inconsistent; because despite providing that demotion "may also be used in the progressive discipline process," the policy did not "specify where demotion falls in the progressive discipline structure"; and because the policy did not clarify whether demotion required a finding of aggravated misconduct. But, citing Utah Code section 17-33-4(1)(d)(iii)–(iv), the court held that despite these ambiguities, "by specific statutory direction the [ALJ] has discretion to interpret and apply the policy, so long as that interpretation and application are reasonable." And here, the court ruled that the ALJ's interpretation that demotion was appropriate discipline for a demonstrated "failure of leadership" was "within the range of reasonableness."

¶19 The court also addressed Lieutenant's and the other corporal's violations of the nepotism policy. It stated, "There is no indication . . . that these other circumstances, including those involving [Lieutenant,] were similar in scope to the conduct of [Cieply] in this case, or that they ever rose to the level of generating a warning. Specifically regarding [Lieutenant], the situation involved indirect supervision that was not repetitive."

¶20 Lastly, the court declined to address Cieply's arguments related to the safety policy violation because the ALJ had ruled that the violation "did not justify the imposition of any of the discipline that was determined to be otherwise appropriate." Accordingly, the court held that any argument related to the safety policy violation was moot.

¶21 Cieply appeals.

## ISSUE AND STANDARD OF REVIEW

¶22 Cieply challenges the district court's holding that the ALJ's order was not arbitrary and capricious. In an appeal of an administrative order that was previously reviewed by the district court, "we review the intermediate court's decision." *McElhaney v. City of Moab*, 2017 UT 65, ¶ 26, 423 P.3d 1284. In so doing, "[w]e afford no deference to the intermediate court's decision and apply the statutorily defined standard to determine whether the court correctly determined whether the administrative decision was arbitrary, capricious, or illegal." *Id.* Here, "the statutorily defined standard" is found in Utah Code section 17-33-4(1)(d)(iii)–(iv). Under that statute, because "the district court relied on the same record we rely on here," *Larsen v. Davis County*, 2014 UT App 74, ¶ 9, 324 P.3d 641 (citing Utah Code Ann. § 17-33-4(1)(d)(iiii) (LexisNexis 2009)), *cert. denied*, 333 P.3d 365 (Utah 2014), we "do not accord any particular deference to the district court's decision," *id.* (quotation simplified), and, instead, "presume the validity of the [ALJ's] decision and review that decision only to determine 'whether the decision is arbitrary or capricious,'" *id.* (quoting Utah Code Ann. § 17-33-4(1)(d)(iv)). An agency's decision is arbitrary and capricious if it "exceeds the bounds of reasonableness and rationality." *Id.* ¶ 17 (quotation simplified).

ANALYSIS

¶23    In reviewing the Notice of Discipline, the ALJ correctly stated that he was limited to making two inquiries: "(1) do the facts support the charges made by the department head, and, if so, (2) do the charges warrant the sanction imposed?"[8] *See Kelly v. Salt Lake City Civil Service Comm'n*, 2000 UT App 235, ¶ 16, 8 P.3d 1048 (quotation simplified). If the answer to either question is in

---

8. We note that the inquiry applied by the ALJ and by the district court, on which the arguments of the parties on appeal are based, was largely developed in the context of appeals from a decision to discharge or suspend municipal employees, which is governed by Title 10, Chapter 3 of the Utah Code. *See* Utah Code Ann. §§ 10-3-1012, -1012.5, -1106(2)(a), -1106(6)(a) (LexisNexis 2022). *See also Nelson v. City of Orem*, 2013 UT 53, ¶¶ 23, 25–26, 309 P.3d 237; *Harmon v. Ogden City Civil Service Comm'n*, 2007 UT App 336, ¶ 6, 171 P.3d 474; *Kelly v. Salt Lake City Civil Service Comm'n*, 2000 UT App 235, ¶ 16, 8 P.3d 1048. It has also been applied to appeals brought by state employees, which are governed by the Utah Administrative Procedures Act. *See* Utah Code Ann. § 63G-4-403(4) (LexisNexis 2019). *See also Ofa v. Department of Human Services*, 2023 UT App 156, ¶ 18, 542 P.3d 511; *Burgess v. Department of Corr.*, 2017 UT App 186, ¶¶ 14, 35, 405 P.3d 937. But appeals by "suspended, transferred, demoted, or dismissed" county employees are governed by Title 17, Chapter 33 of the Utah Code, *see* Utah Code Ann. § 17-33-4(1)(b), (d) (LexisNexis 2017), for which there is sparse statutory guidance or legal precedent on this particular issue. Because neither party has argued that another inquiry is more appropriate in the case of county employees; the inquiry does not conflict with the governing statute, *see infra* note 10; and we see no reason, absent statutory directive, that the inquiry for county employees should differ from that of municipal and state employees, we follow suit and apply essentially the same inquiry to this appeal.

the negative, reversal of the administrative action is warranted. *See id.* Here, because we hold that the discipline imposed was arbitrary and capricious, we limit our discussion to the second prong of the inquiry.[9]

¶24 The second prong is further subdivided into two questions: (A) "is the sanction proportional" and (B) "is the sanction consistent with previous sanctions imposed by the department pursuant to its own policies." *Id.* ¶ 21. *See Nelson v. City of Orem*, 2013 UT 53, ¶ 30, 309 P.3d 237 ("A sanction that is wholly inconsistent with prior disciplinary practices or department policy would be arbitrary and capricious[.]"). Again, unless both questions are answered in the affirmative, the sanction is subject to reversal. *See West Valley City v. Coyle*, 2016 UT App 149, ¶ 29, 380 P.3d 327. But this test need not rigidly apply to every case. *See Nelson*, 2013 UT 53, ¶ 30. "Instead, we consider proportionality and consistency insofar as those standards aid our determination of whether" the decision of the county civil service commission or of the ALJ was arbitrary or capricious.[10] *Perez v. South Jordan City*,

---

9. For this same reason, we do not address Cieply's arguments related to the first prong. Because we reverse the court's order on other grounds, we need not reach the merits of those arguments.

10. As relevant to our review, the only notable difference on this issue between the statutory schemes discussed in note 8 above is the standard of review to be applied by this court. When evaluating disciplinary action taken against municipal employees, we review the final agency decision for an abuse of discretion. *See* Utah Code Ann. § 10-3-1012.5 (LexisNexis 2022) (stating that the Court of Appeals reviews the municipal civil service commission's decision for an abuse of discretion); *id.* § 10-3-1106(6)(c), (7)(a) (stating that the appeals board or hearing officer applies the standard of review "prescribed by the governing body of each municipality by ordinance" and that the

(continued…)

2014 UT App 31, ¶ 24, 320 P.3d 42. We find this inquiry useful to our analysis in this case and hold that because the discipline imposed for the nepotism policy violations was neither

---

Court of Appeals, in turn, reviews the appeals board's or hearing officer's decision for an abuse of discretion). *See also Nelson v. City of Orem*, 2013 UT 53, ¶¶ 25–26, 31, 309 P.3d 237; *Becker v. Sunset City*, 2013 UT 51, ¶ 9, 309 P.3d 223. And in appeals challenging discipline of state employees, the inquiry is likewise employed in reviewing for an abuse of discretion or whether the action is "contrary to the agency's prior practice" without "a fair and rational" justification. *See* Utah Code Ann. § 63G-4-403(4)(h)(i), (iii) (LexisNexis 2019); *Burgess v. Department of Corr.*, 2017 UT App 186, ¶¶ 14, 35, 405 P.3d 937. Although the Utah Administrative Procedures Act does permit review under the arbitrary and capricious standard, *see* Utah Code Ann. § 63G-4-403(h)(iv), we are unaware of any appellate opinions involving discipline of state employees that have applied that specific standard.

In contrast, our review of disciplinary action against county employees is a de novo review of the district court's application of the arbitrary and capricious standard to the county career service council's (or the administrative law judge's, as the case may be) decision. *See id.* §§ 17-33-4(d)(iv), -4.5(2)–(3) (2017); *McElhaney v. City of Moab*, 2017 UT 65, ¶ 26, 423 P.3d 1284. The distinction between the abuse of discretion and the arbitrary and capricious standards of review is not so great as to mandate deviation from this inquiry. *Compare Burgess*, 2017 UT App 186, ¶ 36 ("An agency abuses its discretion when it reaches an outcome that is clearly against the logic and the effect of such facts as are presented in support of the application, or against the reasonable and probable deductions to be drawn from the facts disclosed upon the hearing.") (quotation simplified), *with Larsen v. Davis County*, 2014 UT App 74, ¶ 17, 324 P.3d 641 (stating that a decision is arbitrary and capricious when it "exceeds the bounds of reasonableness and rationality") (quotation simplified), *cert. denied*, 333 P.3d 365 (Utah 2014).

proportional nor consistent, the ALJ's order was arbitrary and capricious, and the district court therefore erred in holding otherwise.[11]

¶25 **Proportionality.** Although "[t]here is no single set of factors that must be considered when conducting a proportionality review," our case law has identified certain factors that may aid in the effort. *West Valley City v. Coyle*, 2016 UT App 149, ¶ 30, 380 P.3d 327. These factors include

> (1) whether the employee has "an exemplary service record," (2) whether the evidence of misconduct is tenuous, (3) whether the employee has been dishonest, (4) whether there are numerous violations, (5) whether there has been "ineffective progressive discipline," (6) "whether the violation is directly related to the employee's official duties and significantly impedes his or her ability to carry out those duties," (7) "whether the offense was of a type that adversely affects the public confidence in the department," (8) "whether the offense undermines the morale and effectiveness of the department," (9) "whether the offense was committed willfully or knowingly, rather than negligently or inadvertently," and (10) whether the misconduct is likely to reoccur.

---

11. Weber County argues that the discipline should be affirmed based on both the nepotism policy *and* the safety policy violations. But the district court held that arguments related to the safety policy were moot. Although the County asserts on appeal that this ruling was incorrect, it did not separately appeal this issue. *See* Utah R. App. P. 4(d). Accordingly, we limit our analysis to the nepotism policy violations.

*Burgess v. Department of Corr.*, 2017 UT App 186, ¶ 38, 405 P.3d 937 (quoting *Ogden City Corp. v. Harmon*, 2005 UT App 274, ¶ 18, 116 P.3d 973). This list is nonexclusive and need not be "rigidly applied." *Leavitt v. Salt Lake City Corp.*, 2019 UT App 70, ¶ 19, 442 P.3d 1217.

¶26 Although the ALJ generally referenced these factors in discussing proportionality, with the exception of the fourth listed factor, he largely found other factors to be more helpful to the proportionality analysis in this case. The factors the ALJ considered were that Cieply "had been previously advised (even if no formal warning was issued) that his working with his wife" violated the nepotism policy and that he should notify a supervisor if it happened again; that he subsequently violated the nepotism policy six times, of which he made one of the assignments himself; and that the violations were a poor example of leadership to subordinate deputies.

¶27 But other factors likewise merited consideration in this case. One factor that should have weighed heavily in the analysis is that, with one exception, the violations were the result of Cieply following orders from superiors who knew that he and his wife were married at the time the assignments were made.[12] Additionally, although the prior sergeant had informally advised Cieply some two months later that working with his wife violated the nepotism policy, that same sergeant issued a written Coaching Note advising Cieply that "policy is a guideline and not a follow per the letter type thing." The Sheriff also testified to this effect.

---

12. Concerning the one instance where Cieply was directly responsible for the assignment, this assignment was made in the context of being regularly assigned by Sergeant to work with his wife. Although Cieply was certainly culpable for that violation, another relevant factor is that he had reason to believe that the nepotism policy's "guidance" carried less weight with Sergeant than it had with the prior sergeant.

Moreover, Cieply testified that he did, in fact, approach Sergeant and tell him that working with his wife violated the nepotism policy, but Sergeant nonetheless continued to assign them to work together, thereby placing Cieply in a difficult position.[13] And when faced with the conflict between following superiors' orders or complying with the nepotism policy's "guidance," Cieply had reason to believe that compliance with the former should carry the day.

¶28   These circumstances drastically altered the context in which Cieply violated the nepotism policy. These additional factors therefore merited consideration in the proportionality analysis. Failure to consider the full context of the violations thus "exceed[ed] the bounds of reasonableness and rationality." *Larsen v. Davis County*, 2014 UT App 74, ¶ 17, 324 P.3d 641 (quotation simplified), *cert. denied*, 333 P.3d 365 (Utah 2014), and the ALJ's proportionality analysis was therefore arbitrary and capricious.

¶29   **Consistency.** "When challenging a sanction's consistency, the disciplined employee must first make out a prima facie case by pointing to specific instances or statistics" to show, "at a

---

13. Although the ALJ made no findings regarding whether such a conversation took place, if Cieply had indeed expressed concerns to Sergeant that went unheeded, resulting in subsequent orders that he violate the nepotism policy, this would have significantly affected the proportionality analysis in this case. Moreover, Cieply's testimony concerning the conversation was not contradicted. Although Sergeant could not recall whether such a conversation took place, he indicated that it "may have." *See generally Nyrehn v. Industrial Comm'n*, 800 P.2d 330, 335 (Utah Ct. App. 1990) ("The failure of an agency to make adequate findings of fact on material issues renders its findings arbitrary and capricious unless the evidence is clear, uncontroverted and capable of only one conclusion.") (quotation simplified), *cert. denied*, 815 P.2d 241 (Utah 1991).

minimum, . . . some meaningful disparity of treatment between himself and other similarly situated employees." *Burgess*, 2017 UT App 186, ¶ 49 (quotation simplified). Here, the ALJ specifically acknowledged, with our emphasis, "that enforcement of the nepotism policy—at least within the Sheriff's Office—*has been at best, inconsistent*" as "there appears to be no evidence that the Sheriff's Office has issued discipline with respect to any other violations of the nepotism policy, despite the fact that there have been other violations."

¶30 Specifically, at least two other employees had previously violated the nepotism policy without receiving any form of discipline: Lieutenant and the other corporal. Lieutenant indirectly supervised his uncle once in late 2019 and possibly "for a longer period of time in 2018." And the corporal, who held the same rank as Cieply, also worked at the same post as his wife, who was likewise a corrections assistant. Additionally, at least one deputy testified that the corporal had supervised his wife, thus indicating that the corporal was also exhibiting a poor example of leadership to subordinate deputies. *See supra* note 5.

¶31 The ALJ distinguished these violations by stating that they were "apparently not as serious as those here" because Cieply, unlike Lieutenant or the other corporal, had previously been advised regarding the policy.[14] But despite Cieply's situation

---

14. The district court added that neither Lieutenant's nor the other corporal's violations "ever rose to the level of generating a warning." But this mischaracterizes the discussion the prior sergeant had with Cieply following the first violation. The ALJ specifically found that it was an "informal discussion" and noted that Cieply received "[n]o formal discipline of any kind" for the first violation, thus indicating that it did not rise to the level of a verbal warning under the discipline policy.

(continued…)

being substantially similar to that of the other corporal, the fact that the corporal never received so much as the same type of informal discussion—which serves as the distinguishing factor between the two cases—is in and of itself an inconsistency. Additionally, when asked why he had not investigated the corporal like he did Cieply, Lieutenant answered that he had never received a personnel complaint against the corporal. But this explanation rings hollow given that Lieutenant had been the one to initiate the personnel complaint against Cieply, thus likewise indicating inconsistent treatment. Additionally, the fact that Lieutenant was of a higher rank than Cieply at the time Lieutenant violated the nepotism policy should have reflected even more poorly on Lieutenant as far as failure of leadership— the main reason the Sheriff and the ALJ gave for the demotion— is concerned. But like the corporal, there was no evidence presented that Lieutenant received so much as an informal warning.

¶32 More importantly, as the ALJ acknowledged, "others that also shared in that blame" for Cieply's nepotism policy violations "received no formal discipline." As discussed in more detail above, Cieply was placed in the unenviable position of having to choose between following supervisors' orders and complying with the nepotism policy. But those who assigned Cieply to work with his wife despite knowing the two were married received no formal discipline whatsoever. Although Lieutenant verbally reprimanded Sergeant on a call, the reprimand was not documented or otherwise formalized. And similar to Cieply's

---

The court also stated that Lieutenant's violation "involved indirect supervision that was not repetitive." But the nepotism policy prohibited both direct and indirect supervision of a relative without distinguishing the two. And the court's statement concerning repetitiveness overlooks the ALJ's finding that Lieutenant possibly supervised his uncle "for a longer period of time in 2018."

informal conversation with the prior sergeant, Sergeant likely (although he could not remember) received an email from the same sergeant advising him not to assign Cieply to work with his wife. It therefore logically follows that if the violations reflected negatively on Cieply's leadership abilities, they would reflect even more negatively on those with the even greater leadership responsibilities that accompany a higher rank. Sergeant's role in the violations would have, at the very least, demonstrated to subordinates an indifference to the nepotism policy. But despite this, Sergeant received no negative repercussions for his own leadership failures.

¶33   For these reasons, we hold that the ALJ's conclusion that the disciplinary action was not inconsistent "exceed[ed] the bounds of reasonableness and rationality," *Larsen v. Davis County*, 2014 UT App 74, ¶ 17, 324 P.3d 641 (quotation simplified), *cert. denied*, 333 P.3d 365 (Utah 2014), and was therefore arbitrary and capricious.

CONCLUSION

¶34   The ALJ's determination that demotion and a temporary pay reduction were proportional and consistent sanctions for Cieply's violations of the nepotism policy was arbitrary and capricious. The district court therefore erred in holding otherwise. We accordingly reverse the district court's decision and vacate the ALJ's order.

———————